Per Curiam :
This case was referred pursuant to Rule 45 to Saul R. Gamer, a trial commissioner of this court with directions to file with his findings of fact recommendations for conclusions of law which the commissioner has done in a report filed May 6,1960. On June 16,1960, defendant filed a motion requesting that the court adopt the report of the commissioner as the basis for the entry of judgment, the plaintiff having failed to file within the 15-day period required by Rule 46(a) a notice of intention to except to the commissioner’s findings and recommendation. Plaintiff has likewise failed to file a response to defendant’s motion.
The court being in agreement with the findings and recommendation of the commissioner, as hereinafter set forth, adopts the same as the basis for its judgment in this case. Therefore, plaintiff is not entitled to recover, and its petition will be dismissed.
It is so ordered.
OPINION OF COMMISSIONER
Plaintiff was the prime contractor on a lump sum contract entered into with the Department of the Navy for the making of additions, modifications, repairs and alterations to certain structures at the United States Naval Auxiliary Landing Field, South Weymouth, Massachusetts. One of the structures at the station upon which work was to be performed was a large hangar, called “Hangar No. 1.” The contract price of $663,000 covered the performance of 28 separate items of work, described in detail in the specifications and drawings which were made a part of the contract. This case involves only one of such items, i.e., that set forth *77 in section 6 of the specifications, headed “Roofing and Flashing, Sheet Metal Work”, insofar as said work was applicable to Hangar No. 1.
The hangar, shaped somewhat like a quonset hut, was a large structure approximately 1,000 feet long, 300 feet wide and 200 feet high. At each end were two large steel doors, which, when opened, permitted a dirigible to pass through. The structure itself was principally composed of thousands of steel sheets or panels, referred to as the “skin” of the hangar.
There were two kinds of sheets, one type called “mansard” sheets and the other “V-beam” sheets. Except for differences in their corrugations, the sheets were similar and served much the same purpose. All the sheets were held together by bolts inserted around their entire perimeters where they overlapped each other. The mansards were at the higher reaches of the hangar, and were attached to the structure by nails driven through solid wood planking. The bulk of the sheets were of the V-beam type, extending from the ground and going up approximately 160 feet to the mansards. There were approximately 14,000 of these panels. These Vdbeam sheets were fastened to certain of the horizontal structural steel framing members, referred to as “purlins”, by a so-called “strap fastener.” This fastener went completely around the purlin, each end of the fastener being bolted to a sheet. Thus, the sheets were held to the structure by these strap fasteners, and not bolted directly to the structural steel. This type of fastening allowed a considerable amount of movement in the sheets, a desirable feature because of the wind stresses and severe climate to which South Weymouth, a hurricane area, is subject. For this reason, such a strap fastener is sometimes referred to as a “floating fastener”, and metal sheets so fastened as a “floating skin.”
In June 1949, the entire station, including the hangar, was deactivated and thereafter no maintenance work thereon was performed. However, in 1951 it was determined to reactivate the station, and the considerable task of drafting plans and specifications for the rehabilitation project, which included both repair and alterations, as well as additions, *78 was commenced. Over a year was involved in this phase of the project, and in February 1953, bids were finally invited, to be submitted by March 3,1953.
A. Belanger & Sons, Inc., of Cambridge, Massachusetts, a firm with long experience in the roofing and sheet metal business, became interested in performing the roofing and sheet metal work described in said section 6 of the specifications, as well as certain other work. Prior to the time when bids were to be submitted, three officials of the firm made a site survey of the project, and thereafter submitted a bid of $106,800 to the various general contractors who were preparing their bids for submission to defendant. Plaintiff was the low bidder and entered into the prime contract with the Navy on April 15, 1953. Negotiations between the plaintiff and the Belanger firm then followed, in which the Belanger proposal of $106,800 was negotiated down to $85,000, and a subcontract in that amount was entered into on April 22, 1953, for the performance of said section 6 specification work, as well as certain other work. Belanger commenced its work immediately.
On May 13, 1953, during the course of a conversation between a Belanger official and defendant’s Besident Officer in Charge of Construction, it first became apparent that there was a radical difference of opinion between them as to the scope of the V-beam sheet roofing work to be accomplished on the hangar. Belying on subsection 6-10 of the specifications stating that “All V-beam roofing sheets shall be refastened * * the Besident Officer considered it to be the contractor’s obligation to insert new fasteners around the perimeters of all the V-beam sheets, thus refastening the sheets to each other, and also to insert such fasteners through the sheets and into the purlins, thus also refastening the sheets directly to the structural steel. This interpretation would require the contractor to do fastening work on each of the approximately 14,000 V-beam sheets in the hangar. However subsection 6-10, in addition to providing that “All V-beam roofing sheets shall be refastened * * *” went on to provide that approximately 350 of such sheets should be removed and replaced with new sheets, and approximately 200 damaged sheets should be repaired, these 550 sheets being further referred to and generally located in another *79 specification subsection, 6-18, and the drawings, and the Belanger official contended that 6-10,6-18 and the drawings, properly interpreted together, required work only on these 550 sheets, with only 200 of them to be “refastened” in the technical sense (as distinguished from the installation of the new 350 sheets which naturally would require fastening as an incident thereof).
As a result of the dispute, each referred the matter to their principals, the Resident Officer to the Officer in Charge of Construction and the Belanger official to plaintiff. Belanger refused to perform the refastening operation on all the V-beam sheets without a written order, maintaining that the work was outside the scope of the contract, and such an order was ultimately given by the Officer in Charge. The work was done by Belanger, plaintiff submitted a claim therefor in the amount of over $97,000 under the “Changes and Extras” article of the contract, and the claim was denied by the Contracting Officer on May 27,1954. After a 3-day hearing at which witnesses were heard and exhibits introduced, the Navy Contract Appeals Panel of the Armed Services Board of Contract Appeals, by an exhaustive opinion issued on June 20,1957, denied plaintiff’s appeal taken under the Disputes article of the contract, and this suit followed, plaintiff alleging the Board’s decision to be arbitrary and capricious.
In light of the unambiguous provision of specification section 6-10 that “All V-beam roofing sheets shall be refastened * * it is obvious that plaintiff assumes a heavy burden indeed in attempting to sustain the contention that it was obliged, under section 6, to refasten only approximately 200 sheets. After a consideration of plaintiff’s contentions, as hereinafter set forth, it must be concluded that plaintiff has failed to sustain such burden.
The two specification subsections upon which plaintiff places reliance are 6-10 and 6-18. These two short sections read as follows:
6-10. V-Beam roof/ng (also indicated as V-Beam siding) . — All V-beam roofing sheets shall be refastened and approximately 350 sheets shall be removed completely and replaced with new units. Approximately 200 damaged sheets of the existing V-beam roofing shall be repaired. All open joints shall be caulked.
*80 6-18. V-heam roofing shall be repaired or replaced in areas as indicated on the drawings. Panels indicated as damaged shall be replaced. Areas indicated as slightly damaged shall be repaired by refastening panels and filling nail and other holes and joints with caulking compound.
Plaintiff argues that 6-10, properly read, merely defines the general scope of the V-beam panel work, being 350 panels to be replaced and 200 to be repaired, and that 6-18 is more definite and designates where the 550 panels are located and how the repair work on the 200 sheets is to be accomplished. One of the drawings indicated, by symbols, the general areas where the “damaged” panels to be replaced and the “slightly damaged” panels to be repaired were located, such locations being generally around both ends where the large doors were located and the areas adjacent thereto. The contention is, therefore, that when 6-10 provides that “All V-beam roofing sheets shall be refastened * * *”, the word “all” really refers only to all of the 200 “slightly damaged” sheets which 6-10 states “shall be repaired” and which 6-18 further states “shall be repaired by refastening panels and filling nail and other holes and joints with caulking compound.” The use of the word “refastening” in 6-18 in connection with the 200 panels is stressed as indicating that when the same word is used in 6-10 in stating “All V-beam roofing shall be refastened * * * ”, it was used only in connection with the 200, it being further argued that the word “refastening” itself can have meaning only when related to something that has once been fastened but has become loose and therefore requires refastening, which plaintiff says was the situation only with respect to the 200. Cases are cited which hold that the word “all” is not always given a comprehensive effect, but sometimes, based on its context, is given a more restrictive meaning. Plaintiff maintains that all the other of the 14,000 V-beam sheets in the structure were, with the exception of a trivial number, tight and needed no refastening whatsoever. (These other loose sheets plaintiff concedes it was its obligation to refasten under a “General Note” on one of the drawings that the contractor should make “all necessary repairs to hangar roof * * * to insure a watertight structure.”) Plaintiff construes the entire proj *81 ect to be essentially a repair one, with the intent simply to replace a few damaged panels and to refasten the few other panels that had become loose over the years, and not as constituting a major refastening operation which would constitute the performance of a great deal of unnecessary work and which would change the basic nature of the structure from a “floating” type to a more rigid one, which would result from attaching the sheets directly to the purlins, as it was directed to do. It contends that no apparent purpose would be served by inserting additional fasteners in sheets that were already tight, that it would be an erroneous design from an engineering viewpoint to inhibit the “floating” nature of the structure by rigidifying it, and that, therefore, the specifications should not fairly be construed as contemplating such a result. And it further argues that the lack of any indication in the specifications as to what kind of fasteners to use in the overall refastening operation, or the method to be used in performing such refastening work, is a further indication that no such operation was contemplated. The type and method described in subsection 6-11 (d), which plaintiff was directed to use, had nothing to do with such operation, plaintiff says, but instead was applicable only to the work of installing new V-beam panels wherever the contract called for such new installations, so that defendant erred when it relied on such subsection for such purpose. It argues that when the Navy really wanted all of a certain type of roofing sheets to be refastened with new fasteners, it made its intent clear by putting the type of fastener and the method of fastening to be employed in the same subsection in which the refastening requirement itself is contained, which was the situation in subsection 6-09 concerning the mansard sheets. That subsection similarly opened up with the same general requirement that “All mansard roofing sheets shall be refastened * * *” but then went on, after requiring the replacement of a certain number of the sheets, to state that “In refastening the sheets which remain * * a certain type of fastener should be used and a certain method employed. And it maintains that, in fact, all the mansard sheets were loose and required refastening.
*82 None of these contentions withstand analysis. There is nothing in the structure or wording of either 6-10 or 6-18 which can reasonably be construed to limit the opening broad and unambiguous requirement of 6-10 that “All V-beam roofing sheets shall be refastened * * *.” The subsection immediately preceding 6-10, i.e., the aforementioned 6-09 pertaining to the mansard sheets, opens in the identical way, and plaintiff had no difficulty in understanding that section as requiring it to refasten all the mansard sheets. That subsection was quite complete in itself because only two categories of sheets were involved, those that were to be completely replaced, and those which remained. But even here, another subsection, 6-17, specified the exact panels to be replaced. The very similar 6-10, however, had three categories, those to be completely replaced (as with the mansards), those to be repaired (for which there was no similar category of mansards) and those that remained (as with the mansards). Subsection 6-18, instead of specifying the exact V-beam panels to be replaced or repaired, as did the immediately preceding 6-17 concerning the mansards, stated that the locations of these panels were indicated on the drawings, and also specified more particularly certain aspects of the repair work, which involved more than simple refastening. But there was nothing in 6-18 that served in any way to restrict the broad scope of 6-10. It concerned itself only with the 550 V-beam panels to be replaced or repaired, as 6-17 was concerned only with the 200 mansards to be replaced. Both 6-17 and 6-18 served in no way to restrict the all-inclusive requirements of 6-09 and 6-10 that all the mansards and all the V-beam sheets, respectively, should be refastened. It seems impossible to give different interpretations to 6-09 and 6-10, as plaintiff does, when, in all material respects, they read almost identically. In its context, therefore, the word “all” in 6-10 is not, as urged by plaintiff, to be given a restricted meaning, as if it referred only to the 200 slightly damaged sheets, but is, instead, to be given its natural, comprehensive meaning as embracing all the V-beam sheets. Similarly, the word “refasten” cannot be restricted so as to refer only to loose sheets, on the theory that something cannot be “refastened” unless, *83 once baying been fastened, it becomes loose. Clearly, the word can also be legitimately employed as referring to a second operation. The first time it was a “fastening” operation, and the second time it would be a “refastening” one, whether or not any apparent looseness had developed between the first and second operations. There is nothing in the inherent meaning of the word that lends substance to plaintiff’s position, and in the context of this contract and its evident purpose, the latter use of the term was the only one that could rationally be employed. An intention to refasten only loose sheets could easily have been so expressed. One would hardly conclude that the intention to refasten only loose sheets would be expressed by the statement “All V-beam sheets shall be refastened”.
The contention that the specifications failed to indicate the type of fastener or the method of fastening to be employed in this large-scale V-beam refastening operation, as did 6-09 for the mansards, and that this further indicates that no such operation was contemplated on the V-beams, similarly cannot be accepted. Such type, referred to as the “top-side type”, and the method to be employed “for securing the sheets to steel framing members” and “to fasten the sheets together”, are all clearly described in 6-11 (d). Subsection 6-11 directly followed 6-10 which required that all the V-beams should be refastened. Their relationship to each other is clear. It matters not that as to the mansards the same subsection, 6-09, included both the comprehensive refastening requirement as well as the fastener type and method of insertion, while as to the V-beams, the comprehensive refastening requirement is set forth in 6-10, while the fastener type and method of application are set forth in the subsection immediately following. There could hardly be any confusion in this arrangement. There was no other provision in any other place describing such type or method for the V-beam sheets, and it is therefore not understood why this provision would not be applicable, as a reading of 6-10 and 6-11 in natural sequence would seem to clearly indicate. That 6-11, including paragraph (d), applies to “new” work, as plaintiff contends, is manifest. But this does not mean that it so applies exclusively and therefore does not also ap *84 ply to the existing panels, for no reason is apparent why the “fastening” work on the new panels, or the 200 panels to be repaired, should be any different from the “refastening” work on the existing panels.
Plaintiff emphasizes that two witnesses for the defendant conceded that 6-11 (d) “might” and “could” be interpreted as applying only to new work. However, the clear import of their entire testimony was that they did not consider that such a construction would, under the circumstances, be reasonable. The rule of construction against the party drafting the document is necessarily premised upon the basic assumption that the alternative interpretation given by the other party to the alleged ambiguous language is a reasonable one and “in accord with the object in view.” L'Engle v. Overstreet, 61 Fla. 653, 55 So. 381, 384. The fact that, by giving words strained or unusual connotations, a certain interpretation might or could be considered conceivable, is not a proper basis for the application of the rule. 12 Am. Jur. § 250.
But even if plaintiff’s interpretation that 6-11 all applies only to “new” work, the term “fastening” being used in 6-11 (d) rather than “refastening”, is accepted, its position would not be improved. It would then be left with a requirement to refasten all the panels without any instruction as to how to perform the operation. However, the requirement would still be there and plaintiff would have to fulfill it somehow. Even if this situation would permit plaintiff to proceed on its own with its own method without instructions from the Contracting Officer, and without compliance with 6-11 (d), in accordance with which plaintiff was here instructed to proceed, plaintiff nevertheless concedes that the 6-11 (d) method was more economical, or at least not more costly, than any other method that could have been employed. It is not the method used about which plaintiff complains. It is the fact that it was required to fulfill the requirement at all which causes this controversy, the alleged lack of instructions as to type and method being advanced as a reason for the nonexistence of the requirement itself. But clearly, lack of specific implementation would not in and of itself serve to destroy the plain basic requirement, *85 which plaintiff could not, in any event, have fulfilled in any less expensive method than that set forth in 6-11 (d).
Nor can any contention based upon the assumption that the great hulk of the V-beam sheets were tight and required no refastening be accepted. Belanger’s prebid site survey, lasting approximately one hour, was not sufficient to arrive at any accurate determination of how many of the 14,000 sheets had loosened during the years, the structure at that time having been 10 years old and deactivated approximately 4 years. It was purely a visual inspection, made without any rigging or staging. Similarly, defendant made no detailed sheet-by-sheet examination to ascertain how many were loose. All it knew, from many visual inspections during the deactivation period, including seeing many fallen and falling bolts, was that at least a substantial number were loose and needed retightening. The contention that no one could tell that defendant wanted to do such a wasteful thing as to refasten approximately 14,000 tight sheets that required no refastening is based upon an inaccurate premise, for the credible evidence compels the conclusion that a very large number were, in fact, loose. This would in no way be a surprising conclusion, considering the wind stresses and severe climate to which the structure was subject in this hurricane area, with no maintenance work being performed during a 4-year deactivation period. Even regarding this contract as strictly a “repair” one, as plaintiff urges, the refastening of all the sheets would, under the circumstances, be an operation which should fairly have been considered as falling within its intended scope.
Similarly, the assertion that it could hardly be surmised that defendant would, by this contract, desire to effect such a radical change as to convert the basic nature of the structure from a “floating” one to the less desirable “semirigid” type, is lacking in factual support. While driving the topside (also referred to as “top-speed”) fasteners through the sheets and directly into the purlins would tend to rigidify the structure somewhat, again the credible evidence is that this would have only a trivial effect upon the total ability of the structure to withstand wind stresses, and that whatever adverse effect this might have from an engineering *86 point of view would be more than compensated by the overall advantages to be obtained by the method adopted. In any event, whether or not someone else would have effected the rehabilitation of the structure in a different, or even in a better, manner is essentially irrelevant. Any owner is entitled to have a construction project consummated in such manner as he may desire and to have the contract fulfilled in accordance with its terms. Farwell Company, Inc. v. United, States, 137 Ct. Cl. 832.
Based on all of the above considerations and analysis of the contract provisions, it must be concluded that the specifications are not ambiguous and required the refastening of all the V-beam sheets.
This conclusion is fortified by a consideration of what was defendant’s intent in drafting the specifications. The intent of a party to a contract in entering into it, and his understanding of the contract, is relevant to the general question of interpretation. Petrolite Corporation, Ltd. v. United States, 142 Ct. Cl. 108. It is true, of course, that regardless of the owner’s actual intent, if he failed to convey such intent clearly, but instead, wrote ambiguously, so that another interpretation was reasonably possible, familiar principles of contract interpretation justify interpreting the document against the writer. Hongkong & Whampoa Dock Co. v. United States, 50 Ct. Cl. 213, 222-223. Nevertheless, in view of plaintiff’s vigorous contention at the Board hearing that defendant could not have originally intended the interpretation which was ultimately placed upon the specifications, defendant’s original intent was inquired into at the trial proceedings in this court. This would also serve the purpose of ascertaining whether defendant was being made the recipient of a windfall. However, this inquiry disclosed that defendant’s Resident Officer, as well as the Officer in Charge and the Contracting Officer, in fact construed the specifications consistently with the way in which the original project planners and specification writers intended.
The writing of the specifications for this project was, by independent contract, delegated to an architectural firm, to be done under the supervision of, and in close coordination *87 with, the Design Division of the First Naval District, Bureau of Yards and Docks. However, the architect had no facilities for top level roof surveillance work, so the Navy entered into still another contract with a sheet metal and roofing firm to make such a survey. The roofing company’s proposed specification for the V-beam portion of the project was “Replace approximately 300 sheets, and repair approximately 150 sheets which are slightly damaged. Refasten all loose sheets. * * and the architect, in his final draft of the specifications submitted to the Design Division, included such specification. Had the final specifications been issued in this form, there could, of course, be no question but that plaintiff’s contention that it was obligated to refasten only loose sheets should be upheld. But the official of the Design Division who was in charge of the project and who had the ultimate responsibility for the plans and specifications, specifically rejected the proposal “Refasten all loose sheets.” Although he knew that a substantial number of sheets were loose, he felt that no one would be able to tell, without a close sheet-by-sheet examination, exactly how many sheets required refastening. Such an examination would be exceedingly costly, requiring expensive interior rigging in addition to exterior rigging, since the bolts were inserted from the exterior of the structure, and the nuts were on the interior. Similarly, a bolt-tightening 'and replacement operation would require two men, one on the outside and one on the inside. He correctly concluded it would be more economical and speedy simply to refasten all the sheets by using a commonly employed “top-side” or “top-speed” fastener, driven in by power equipment, which can be inserted by one man working only on the outside. In addition, he felt that requiring the refastening of all the sheets would afford a definite and fixed basis of bidding, for bidders could not reasonably he expected to determine how many sheets were loose. Furthermore, the hangar had been subject to 4 years of deactivation, without maintenance, and bolts and nuts were becoming progressively weaker. Unless all the sheets were then refastened, sheets untouched, because apparently tight, might present maintenance problems almost immediately after the completion of the project. Even the loss of one sheet during *88 a hurricane might result in the loss of the entire hangar, and, considering the planned housing of expensive equipment in the hangar, he felt that the refastening of all the sheets was called for. He concluded that the insertion of fasteners directly into the purlins would not have a serious rigidifying effect. Accordingly, for all these reasons, he deleted the “Refasten all loose sheets” provision and instead added the provision that all the sheets should be refastened. In addition, he noted that the proposed specifications contained no provision specifying the type of fastener to be used or the method to be employed, and therefore added subsection 6-11 (d). With these changes, the specifications were issued to the bidders, including plaintiff and Belanger. Based on these considerations, plaintiff’s contention that defendant did not originally intend any such result as was produced by the interpretation of the Resident Officer, the Officer in Charge and the Contracting Officer is without substance. The interpolation of the words “that are loose” in the provision “All V-beam roofing sheets shall be refastened * * so that the provision would read “All V-beam roofing sheets that are loose shall be refastened * * *”, as plaintiff seeks to have done, would manifestly be unjustified. “It is not allowable for the court, by construction, to import words into a written contract which materially change its meaning as expressed by the parties.” Hongkong & Whampoa Dock Co. v. United States, supra, at p. 223.
The subcontractor maintains that, as a result of its site survey and its reading of the specifications and drawings, it did not include the cost of refastening all the V-beam sheets in its bid to the prime contractor. The prime contractor complains in turn that such cost was not included in its bid to defendant. These contentions are not persuasive. Including such additional costs, the total amount expended by the subcontractor in the performance of the subcontract in its entirety exceeded the amount it has been paid (substantially the subcontract price) by the sum of approximately $2,800. Were this action to succeed and the subcontractor to be reimbursed the amount of approximately $44,000 which it expended on the refastening item in question, it would then receive total compensation of over $128,- *89 000 as against total costs and expenses of approximately $87,000. This would leave it with a profit of over $40,000, amounting to approximately 30 percent of the total amount received, and approximately 45 percent of its total costs and expenses. The unusually large profit that would result from a recovery herein is hardly consistent with the claim that the subcontractor did not originally intend to accomplish the item of work in question. The small loss it did suffer on the subcontract, even after the performance of the item, is more consistent with the conclusion that it did in fact intend to perform the work, a loss that resulted from reducing its original bid price of $106,800 to $85,000 at the time it executed the subcontract. Further, the Government’s estimate for the roofing work on this contract was generally in line with the subcontract price.
Finally, an independent basis for denying recovery lies in the subcontractor’s admission that, even prior to submitting its original bid to the prime contractor which was, in turn, prior to the submission of the prime contractor’s bid to defendant, the subcontractor was fully cognizant of the very issue and problem herein involved, and yet did nothing, by way of making proper inquiry, to receive the clarification to which it was entitled. During the course of the subcontractor’s site survey, one of its officers (its treasurer and general manager), after studying the drawings and specifications, which he had with him at the time, and as a result of the visual survey, found himself uncertain about the extent of the V-beam sheet refastening work that would be required, and made inquiry with respect thereto of the escort the station had provided to guide and accompany the survey party. The respective versions of the conversation that followed differ sharply. The subcontractor’s official testified at the trial that the escort, the chief concrete inspector at the station (who later was to act in such capacity on the instant contract) , in reply to the official’s direct question as to the meaning of the provision in subsection 6-10 that “All V-beam sheets shall be refastened * * *” and whether this meant that the contractor would have to go over 'all the sheets in the structure and refasten them, advised that that would not be required. The inspector is alleged to have stated that it was not the intent of the contract to fasten sheets that were tight *90 and that the V-beam sheet work was limited to the 550 sheets to be replaced and repaired. The inspector vigorously denies this. He testified he did not and could not have made such a statement since at the time he had not even read the specifications, and that, in his then capacity as an escort and nothing more, he would have had no authority to interpret specifications for contractors and to do so would violate standing instructions. He insists that he specifically explained this to the subcontractor’s official and advised him to take the matter up with the Resident Officer, the only one at the base who was authorized to give interpretations of this kind.
Since the testimony of the subcontractor’s official at the Appeals Board hearing as to the conversation differed from his testimony at the trial herein, and since the inspector’s version of the conversation appears, in light of all the facts and circumstances, to be the more natural and logical, the finding has been made (finding 8 (a)) that the conversation was as the inspector testified at the trial. The dispute involved in this case became apparent for the first time in a subsequent conversation between the same official of the subcontractor and the Resident Officer. Had the prior conversation between the subcontractor’s official and the inspector actually been of the nature testified to by the official, it seems incredible that he would not at least have referred to and relied upon it at such subsequent conversation with the Resident Officer. However, the record does not indicate that he even mentioned it. But even if the conversation were as described by the subcontractor, it would not, of course, be binding upon defendant as an authoritative interpretation upon which plaintiff could rely, since the employee was only an inspector. Woodcraft Corporation v. United States, 146 Ct. Cl. 101; James McHugh Sons, Inc. v. United States, 99 Ct. Cl. 414, 432. Furthermore at the time he had no connection with the project at all, except to act as guide and escort to proposed bidders. In any event, the exact nature of the conversation is essentially irrelevant. The “Instructions to Bidders” which accompanied the Invitation for Bids, which the subcontractor had seen and with which it was familiar, specifically warned bidders that “any explanation desired” *91 concerning “the meaning or interpretation of the drawings and specifications must be requested in writing and with sufficient time allowed for a reply to reach them before the submission of their bids.” It further went on to state that “Oral explanations or instructions given before the award of the contract will not be binding” and that any interpretation so made would be “in the form of an addendum to the specifications or drawings and will be furnished to all bidders * * With this warning, the subcontractor’s action, even before it bid, in raising the specific question of interpretation herein involved and then failing to seek an authoritative determination in the manner specified, or without doing anything about the matter at all except to discuss it with a subordinate employee whose only function at the time was to act as an escort or guide, is wholly inexplicable. For this reason alone, recovery should be denied. Cf. Anderson, Ex’r. v. United States, 143 Ct. Cl. 729.
Defendant has raised certain other defenses based upon the prime contractor-subcontractor relationship. At the trial, it appeared for the first time (despite pretrial discovery proceedings) that the subcontractor, upon the completion of its work, and in order to obtain final payment from the prime contractor, had executed a release. This document, seemingly mislaid or lost, was not produced at the trial. Nevertheless, plaintiff does not regard the release as insulating itself from liability to the subcontractor for the work in question, and, in open court, by its attorney, admitted such liability. However, defendant maintains that, after the disclosure of the release, plaintiff did not, by competent testimony, sustain the burden cast upon it of showing that the release did not effectively serve to protect itself against liability to the subcontractor and that the release, therefore, must be presumed to have had such effect. No representative of the plaintiff itself gave any testimony in this case. Defendant further argues that since the increased costs were incurred by the subcontractor, plaintiff has no basis for a suit in its own name because it has suffered no damage. This suit is not specifically brought for the use and benefit of the subcontractor. Nevertheless plaintiff, again in open court, by its attorney, stated that, in the event of recov *92 ery, it will, after making certain deductions for profit and overhead, turn the balance over to the subcontractor.
In view of the disposition of the case on its merits, as set forth above, it is not felt necessary to make a recommendation to the court with respect to these contentions.
Based upon all the facts and considerations hereinabove set forth, it is clear that the work involved in this controversy was, beyond any reasonable doubt, required by the contract. The Appeals Board’s decision to this effect was, in view of the evidence before it as well as the additional evidence introduced before this court, not arbitrary or capricious, was supported by substantial evidence, and was in fact correct. It is therefore recommended that the petition be dismissed.
FINDINGS OF FACT
1. Plaintiff is, and at all times material hereto has been, a corporation organized under the laws of the Commonwealth of Massachusetts, with its usual place of business located in Cambridge, Massachusetts.
2. On April 15,1953, plaintiff entered into a contract with defendant, acting by an official of the Civil Engineer Corps, Bureau of Yards and Docks, Department of the Navy, as Contracting Officer. The contract, designated as “No. NOy-73792, Specification No. 34833” was in the lump sum amount of $863,000, and required plaintiff to “furnish the materials, and perform the work for providing and securing additions, modifications, repairs and alterations to certain structures, complete and ready for use, at the U.S. Naval Auxiliary Landing Field, South Weymouth, Massachusetts,” all in accordance with certain designated specifications, schedules and drawings, which were made a part thereof.
3. The contract provided in pertinent part as follows:
ARTICLE 3. — GOVERNMENT AND CONTRACTOR’S REPRESENTATIVES
(a) The work will be under the general direction of the Contracting Officer, who shall designate an officer of the Civil Engineer Corps, United States Navy, or other officer or representative of the Government, as Officer in Charge of Construction, hereinafter referred to as the “Officer in Charge,” who shall, under the direction *93 of the Contracting Officer, have complete charge of the work, and shall exercise full supervision and general direction of the work, so far as it affects the interest of the Government.
* $ * # $ ARTICLE 5. — SPECIFICATIONS AND DRAWINGS
(a) GonfActs — Omissions—Misdescription—Misinfor-mation. — The Contractor shall keep on the work a copy of the drawings and specifications and the Officer in Charge shall at all times have access thereto. Anything mentioned in the specifications and not shown on the drawings or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between the drawings and specifications the specifications shall govern. Omissions from the drawings or specifications or the misdescription of details of work which are manifestly necessary to carry out the intent of the drawings and specifications, or which are customarily performed, shall not relieve the Contractor from performing such omitted or misdescribed details of work but they shall be performed as if fully and correctly set forth and described in the drawings and specifications. ❖ # # ❖ *
(e) Interpretations and Instructions. — All questions regarding the figures, drawings, plans, and specifications and the interpretation thereof and the resolving of conflicts and inconsistencies therein shall be determined by the Contracting Officer, and such determination shall be final, subject only to appeal under the provisions of Article 16. $ & $ $ $
ARTICLE 10.-CHANGES AND EXTRAS
(a) The Contracting Officer may at any time or times, by a written order, and without notice to the sureties, make changes in the drawings or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the cost of doing the work under this contract, or in the time required for its performance, an equitable adjustment in the pertinent contract terms shall be made as hereinafter provided and the contract shall be modified in writing accordingly, Any claim of the Contractor for such an adjustment must be made in writing to the Officer in Charge within *94 10 days from the receipt of such change order or within such longer period as may be allowed by the Contracting Officer. If the Officer in Charge considers that such change should result in a decrease in the Contractor’s compensation or time for performance or both, he. shall so notify the Contractor. In either case, the equitable adjustment shall be made in accordance with the mutual agreement of the parties, provided, however, that if the parties are unable to agree, the Contracting Officer shall determine such equitable adjustment, if any, to be made in the contract terms, and his determination shall be final, subject only to appeal under the terms of Article 16. In making such determination, the Contracting Officer shall, in those instances where the adjustment to be made in compensation is estimated by the Officer in Charge to amount to $10,000 or more, convene, and give foil consideration to the report of, an advisory board of three members, consisting of two Government representatives appointed by the Contracting Officer and one representative appointed by the Contractor. This board shall estimate and report to the Contracting Officer the amount of the change in cost, time, or both, resulting from the ordered change. In making such estimate, the estimated cost of additions shall be based upon the estimated actual cost to the Contractor and the estimated cost of deductions shall be based upon the estimated cost to the Contractor as of the time the contract was made. To such cost estimates, 6 percent shall be added by said board to adjust the Contractor’s profits. In arriving at the amount of the change in pnce, if any, allowance may be made at the discretion of the Contracting Officer for overhead and general expenses, plant rental, and other similar items.
(b) Nothing provided in this article shall excuse the Contractor from diligently proceeding with the prosecution of the work so changed. ^ ‡ t¡( ‡
ARTICLE 16. — DISPUTES
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Con *95 tracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive; Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision. sfc % # * $
ARTICLE 36. — ORAL MODIFICATION'S
No oral statement of any person whomsoever shall in any manner or degree modify or otherwise affect the terms of this contract and, except as otherwise herein provided, no charge may be made for any extra work or material unless the same has been ordered in writing by the Contracting Officer. »[{ íj» «{• íjt
4. While the contract encompassed many items of work, the only item material to the issue before the court in this case concerns the performance of the roofing phase thereof. The roofing work was to be accomplished on a structure designated as Hangar No. 1. The specifications (Specification No. 34833), as amended by two addenda, provided in pertinent part as follows:
SECTION 1. GENERAL CLAUSES
1-01. General intention. — It is the declared and acknowledged intention and meaning to provide and secure, complete and ready for use, the rehabilitation and additions to certain structures.
1-02. General description. — The work shall include additions, modifications, alterations and repairs to the existing structures and facilities, by providing plumbing, sprinklers, compressed air, heating, ventilation, roofing, structural, architectural, communication, and electrical changes and repairs to the existing hangar and leantos.
The additions to existing Hangar No. 1 shall include an exterior two-story steel frame, concrete and masonry structure on the northerly side about 30' wide by 302' long and 24' high, an interior one-story extension of *96 similar construction at the east end of the existing south leanto about 24' wide by 80' long and 14' high, a mezzanine steel and concrete floor in the existing north leanto about 225' long by 87' wide, an interior parachute drying locker of steel, concrete and masonry construction within the existing south leanto and about 27' long by 14' wide and 49' high, and an exterior steel, concrete and masonry crash truck garage about 26' wide by 33' long and 18' high. # $ $ $ ‡
SECTION C. ROOFING AND FLASHING, SHEET METAL WORK *****
_ 6-09. Mansard roofing (also indicated as mansard siding). — All mansard roofing sheets shall be refastened, and approximately 200 33 inch by 9 feet sheets of the roofing where shown and as scheduled shall be removed completely and replaced with new units. In refastening the sheets which remain, all fastenings shall be driven thru new holes not less than 2y2 inches away from the existing holes. Fastenings shall be made by the use of 2%-inch, drive nails with lead and steel washers. All open joints shall be caulked.
6-10. V-Beam roofing (also indicated as V-Beam siding). — All V-beam roofing sheets shall be refastened and approximately 350 sheets shall be removed completely and replaced with new units. Approximately 200 damaged sheets of the existing V-beam roofing shafi be repaired. All open joints shall be caulked.
6-11. Protected steel roofing and sidmg shall be of the deep corrugation type having corrugations of about 5%-inch pitch and about 1%-inch overall depth for V-Beam roofing and siding. Mansard roofing and siding shall have corrugations similar to existing. The minimum end laps for siding and roofing shall be 4 inches and 6 inches, respectively, except that where the slope of the roof for the deep corrugation type roofing is 3 inches in 12 inches, or between 3 inches and 2 inches in 12 inches, the end laps shall be not less than 9 inches. Minimum side lap for deep corrugation type roofing and siding shall be one-half corrugation (about 2*4 inches). The steel for cores shall be hot or cold rolled sheet or strip steel, as standard with the manufacturer, and conforming to the applicable requirements of specification no. 47S28. Protected steel roofing and siding shall include all flashings, fascias, soffit, covering, corner boards, ridge rolls, closures, fastenings and accessories, as necessary to provide complete and weathertight in *97 stallations; such, shapes and accessories shall be of material similar to, and suitable for use with the material and methods of installation used. Interior and exterior surfaces of roofing and siding shall be provided with black finish of the type standard with the manufacturer. The coatings, after setting, shall not be affected by ordinary temperature changes, shall not flow at temperatures of 150 degrees F., and shall not chip or crack away from the steel core under field erection handling at temperatures between plus 10 degrees F. and minus 10 degrees F. The thickness and weights per square foot of all new sheets shall be not less than those of existing sheets.
(a) Materials. — Protected steel roofing and siding shall be a mill-fabricated product and shall have the steel core, including the ends and edges, sealed hermetically at the factory with protective coverings and coatings by one of the following methods:
(1) The steel core shall be cleaned thoroughly, shall be zinc-coated to conform to the requirements for class 3 or 4 coating, of specification no. QQ-S-775 (Navy Ships), the zinc being fused to the steel; while the zinc is in a molten state a layer of unsaturated asbestos felt shall be pressed over it on each side of the sheet, squeezing the fibers of the felt into the molten zinc. After the steel core is covered, the asbestos felt on both sides of the core shall be impregnated thoroughly with an approved asphaltic compound. The exterior surfaces of the roofing and siding shall be finished with a heavy weather-resistant coating of a water-repellent, fume, corrosion and chemical-resistant bituminous compound as standard with the manufacturer.
(2) The steel core shall be cleaned thoroughly, shall be given a phosphatizing treatment, coated with a nonflammable, resinous, and rust-inhibitive bonding agent and adhesive; while the adhesive is in a plastic state a layer of unsaturated asbestos felt shall be pressed over it on each side of the sheet, squeezing the fibers of the felt into the adhesive. After the steel core is covered, the asbestos felt on both sides of the core shall be impregnated thoroughly with an approved asphaltic compound. The exterior surfaces of the roofing, and siding shall be finished with a heavy weather-resistant coating, of a water-repellant, fume, corrosion and chemical-resistant bituminous compound standard with the manufacturer.
(b) Sealing strips and closures shall be formed, of approved compressed bituminous impregnated materials of the same respective types as the roofing and siding.
*98 The strips and closures shall be furnished and installed at open ends of corrugations and where necessary to provide weathertight construction; they shall be of the thicknesses and widths necessary to close the respective openings completely and shall be formed and shaped in a manner to fit the corrugations and other shapes tightly. The sealing strips and closures shall be secured in place rigidly by means of wire ties, self-tapping screws, or other suitable and approved means.
(c) Plastic cement conforming to the requirements of specification no. 7Y shall be provided to seal all side and end laps in roofing of the deep corrugation type where the slope of the roof is 3 inches in 12 inches or less. The cement shall be applied by means of a pressure gun which will issue a ribbon of material 1 inch wide and not less than 34-inch deep. Where the slope of the roof is 2 inches in 12 inches, all contact surfaces of side and end laps in roofing shall be filled solidly with plastic cement, having a uniform thickness of not less than y16-inch over the entire surface. Plastic cement shall be used also for sealing all joints in and around sealing or closure strips at ridges, eaves, and valleys; at the bottom course in siding on vertical surfaces; for daubing bolt holes before inserting fasteners; for all flashings and corner boards; and elsewhere as necessary to provide weather-tight construction.
(d) Fastenings. — Except where specified otherwise herein, all fastenings shall be of the top-side type. Fasteners for securing the sheets to steel framing members shall be of the drive-screw type or of the self-tapping type, and shall be not less than 34-inch diameter, or number 12 diameter, of zinc-coated heat-treated or special alloy steel, or of corrosion-resisting steel of suitable alloy. For securing roofing and siding to steel framing members at every bearing on steel, not less than three fasteners shall be provided at each end lap, and at each intermediate bearing where the sheets span more than two framing members; these fasteners shall be applied in the valleys of the corrugations and shall be provided with polymerized chloroprene or other type of approved washers standard with the manufacturer. For both roofing and siding, sheet metal screws not less than number 14 diameter, of the same material as the drive or self-tapping screws (except that they need not be heat-treated) and the necessary washers shall be provided through the crest of every high corrugation of the deep corrugation type and at every third corrugation of the standard corrugated type at each end lap, to fasten the *99 sheets together; similar sheet metal screws and washers spaced not to exceed 12-inches on centers shall be provided at each side lap of roofing and siding, to fasten the sheets together, except that where the roof slopes are 2 inches m 12 inches, the fasteners shall be spaced at not to exceed 9-inch centers on side laps of roofing. All flashings shall have a minimum end lap of 4 inches and shall be fastened at not to exceed 12-inch centers. Non-ferrous wire or self-tapping screws shall be used for attaching the sealing strips and similar materials; wire shall be not less than 0.062-inch diameter.
(e) Installation. — Except as specified otherwise, all materials shall be installed in accordance with the manufacturer’s instructions. Where it is necessary to cut the sheets in the field, or where any of the factory applied coverings or coatings are abraded or damaged in handling or installing, they shall, after the necessary repairs have been made, be approved before being installed. All cut ends or edges, or openings through the sheets shall be sealed completely. The top exposed surfaces of all fasteners shall be sealed upon completion. Care shall be exercised before and during installation, to prevent any damage to the roofing and siding sheets. The sheets shall be the greatest, practicable length to suit the purlin and girt spacing indicated. End laps of roofing shall be located over purlins and end laps of siding shall be located over girts. All sheets for roofing and siding shall span over not less than three supports, unless indicated otherwise.
6-12. Flashing for mansard and 'I-beam roofs. — Approximately 20 sheets shall be removed and replaced with new flashing of same size and weight as material removed and the balance shall be repaired and refastened.
6-13. Fastener rails. — Flashing around all fastener rail supports shall be removed and replaced with new similar material. One 6 foot length of rail located between bays 24 and 25 on South side of hangar shall be removed and replaced. All castings inside the hangar roof which hold the fastener rails shall be removed and then securely fastened back in position.
6-14. Snow guards of zinc-coated metal shall be replaced where missing and all other units shall be re-secured and repaired as required.
6-15. Existing flat metal roofs shall be repaired. Where gutters are loose they shall be refastened and all flashings at plumber’s vents shall be repaired. New ventilator covers shall be installed on two vent curbs. *100 Kepair and refasten existing roof vents and make flashing watertight. * * * * *
6-17. General schedule of refairs. — The following schedule is approximate only and must be verified to the actual job conditions but shall be used for the basis of the Bid. Mansard roofmg panels are approximately 9'-0" long in top course; replacements shall be:
[Here follow two schedules, one for the “North Side” and one for the “South Side”, designating the exact locations of the panels to be replaced.]
6-18. V-beam roofing shall be repaired or replaced in areas as indicated on the drawings. Panels indicated as damaged shall be replaced. Areas indicated as slightly damaged shall be repaired by refastening panels and filling nail and other holes and joints with caulking compound.
6-19. Corrugated metal roofing shall be installed on Motor Generator room where shown and as specified in paragraph 6-11. *****
One of the drawings (Y & D Drawing No. 594513) accompanying the specifications and made a part thereof contained a “General Note” thereon which read:
Contractor to make all necessary repairs to hangar roof, to roof of hangar doors and to existing lean-to roofs to insure a watertight structure.
This drawing also indicated, by certain symbols, the general area locations of the damaged and slightly damaged V-beam roofing sheets or panels referred to in paragraphs 6-10 and 6-18 as requiring replacement or repair. These areas were concentrated around the ends of the hangar where the movable doors were located, and the side areas adjacent thereto.
5. The construction of the structure designated as Hangar No. 1, which was shaped like a quonset hut, was completed in 1943. It was a steel truss-type structure with each truss connected by structural steel framing members or girders called “purlins.” The exterior of the structure was made up of over 14,000 metal sheets. The upper reaches of the hangar roof consisted of “mansard” sheets which were fastened by nails to solid wooden planking. The lower *101 reaches consisted of “V-beam” sheets which were fastened to one another, at the sides and ends where they overlapped, by means of bolts aronnd the entire perimeter of the sheets, approximately 6 inches apart. The sheets were held secure on the inside with nuts and to the structure itself by steel “strap hangers” which passed over and around the purlins, the ends of which were similarly bolted to the sheets, one bolt being above the purlin, and the other below. Each sheet spanned two purlins and was held by two strap fasteners. Fastening the sheets to the purlins by the strap hangers in this maimer permitted some movement in the sheets in response to wind stresses. For this reason, such strap hanger fasteners are sometimes referred to as “floating fasteners”, and metal sheets so fastened to the structural steel as a “floating skin”, the weight of the sheets being on the strap hangers, the sheets not being fastened directly to the purlins. The distinction between mansard sheets and V-beam sheets is basically in the size and shape of the corrugations present in the sheets. The V-beam sheets have corrugations shaped like an inverted V, whereas the mansards have a flat space between the corrugations. Other than this difference in the shape of the corrugations, the sheets are generally used for the same purpose.
The structure itself was approximately 960 feet long, 300 feet wide and 200 feet high. At each end there was a pair of steel doors, equally divided, which operated on railroad gauge tracks and which, when opened, caused each door to slide to the respective sides of the structure so that a dirigible could pass through. Because of its size, the severe weather encountered in the area created continuous maintenance problems with respect to the upkeep of the hangar. South Weymouth, where this Navy installation is located, is a hurricane area.
6. The Naval Auxiliary Landing Field (originally known as the United States Air Facility), including Hangar No. 1, was deactivated on June 30, 1949. In 1951, it was determined to reactivate the facility and work was thereupon commenced on the preparation of the plans and specifications involved in the instant contract. The District Public Works Office, First Naval District, Boston, Massachusetts, *102 (hereinafter called the District) which was a field office of the Bureau of Yards and Docks, Department of the Navy, entered into a contract with the architectural firm of Chester A. Browne and Associates (hereinafter referred to as “Browne”) to prepare the plans and specifications, under the supervision of the District. The work was accomplished by Browne in close consultation with the District and extended over a period of over a year, the bids for the project being invited in February 1953. During this period, Browne advised the District that he had no qualified men for high level surveillance of the roof of Hangar No. 1 and accordingly was in no position to obtain the information necessary to prepare specifications on this phase of the work. As a result, the District entered into an independent contract with the Federal Sheet Metal & Roofing Company to make a survey of the roof of the hangar. This survey was made by Federal Roofing, which then submitted recommended “Specifications for Roof Repairs” of the hangar to the District, which in turn were made available by the District to Browne for use in preparing the roofing specifications. Upon completion of Browne’s draft of the specifications, Browne then submitted it to the District for review and approval.
7. (a) Included in the recommendations made by the Federal Sheet Metal & Roofing Company were the following proposed specifications:
MANSARD ROOKING:
Refasten all mansard roof sheets. Replace approximately 200 sheets of mansard roofing. Do not use the present fastening holes. New fastenings to be moved at least two inches from the present fastenings. Use 214-inch drive nails with lead and steel washers for these fastenings. Caulk all open joints.
V-beam rooking:
Replace approximately 350 sheets, and repair approximately 200 sheets which are slightly damaged. Refasten all loose sheets. Caulk all open j oints.
In the final draft of its recommended specifications submitted to the District, Browne included said Federal Roofing recommendations. However, the official (known as the “project coordinator”) in the District Office who was responsible *103 for the ultimate approval of the plans and specifications as they would be submitted to bidders, and who was also in charge of supervising Browne’s work, upon reviewing the proposed specification with respect to the V-beam roofing, determined that the recommendation “Refasten all loose sheets” should not be adopted and that instead all the V-beam sheets should be refastened. This official, who was a qualified engineer employed in the District’s Design Division, so concluded for the following reasons:
(1) During the period of over a year that Browne was working on the plans and specifications, the project coordinator visited the project site frequently and as much as approximately three times a month. On these visits he had observed fallen bolts and nuts strewn on the floor of the hangar and had sometimes seen them falling. He also observed that various bolt holes were becoming enlarged. During the deactivation period, the hangar had been subjected, without maintenance, to the severe weather and winds of the area. He felt that it would be impossible to determine exactly how many of the approximately 14,000 sheets were loose and in need of refastening without a physical examination of each sheet and each of the thousands of nuts and bolts on all the sheets, which examination would be an extremely costly operation involving, among other things, expensive interior and exterior rigging. However, his observations of the hangar, as well as his familiarity with the severe local weather conditions, led him to conclude that a very large number of the sheets were loose and required refastening. Furthermore, even if a sheet appeared tight, progressive deterioration from the movement of the sheet caused by wind stresses and strains through the years could cause it to loosen in a relatively short period of time, so that a constant maintenance problem might well result. He felt, therefore, that the only way that it could be made certain that the roof would remain tight for a reasonable period in the future was to refasten all the panels, and thus insure protection to the expensive equipment it was planned to house in the hangar. The breaking loose of even one sheet during a hurricane could result in the loss of the entire structure. Under the circumstances, he therefore felt the sitúa *104 tion warranted the refastening of all the sheets. The refastening method he contemplated was the insertion on the exterior of the sheets of a type of so-called “top-speed” or “top-side” metal screw fastener, driven in by power equipment, which would hold the sheets together at the edges where they overlapped. The same type of fastener would also be employed to fasten the sheets directly into the pur-lins. This is a speedy, economical, and frequently employed method of fastening that can be accomplished by one man operating from the outside with only exterior rigging being required, whereas a bolt and nut operation would require one man on the outside to insert the bolt and another on the inside to tighten the nut, with both exterior and interior rigging being necessary. The direct attachment of the sheets to the purlins would serve to change somewhat the floating type of attachment by the strap fasteners, hereinabove described, to a more rigid type, and the structure itself would be changed from a “floating” type to a so-called “semirigid” one. The project coordinator felt, however, that this would not cause undue restriction in the flexibility of the structure, and would not be a serious overall disadvantage in light of the many advantages to be gained by the complete refastening in accordance with the proposed procedure.
(2) The specification proposed by Federal Eoofing and Browne to refasten only the loose sheets would cause an element of uncertainty to be reflected in the bidding, since bidders would not be able to ascertain accurately how many of the sheets were loose. The requirement that all sheets be refastened would present a firm, specific basis for bidding, with all bidders then bidding on a definite, fixed amount of work.
(b) As a result of the above considerations, the project coordinator changed the V-beam specification so as to read as is set forth in paragraph 6-10. (finding 4) In addition, he noted that while the proposed specifications as submitted contained a provision concerning the type of fasteners to be used in refastening the mansard sheets, there was no specification concerning the type of fastener to be used on the V-beam sheets. Accordingly, he added a specification, 6-11 (d), (finding 4) for this purpose.
*105 Browne thereupon revised the proposed specifications so as to incorporate the project coordinator’s changes and additions, and the specifications, in the form set forth in finding 4, were the ones winch were made available to bidders when bids were invited in February 1953.
8. (a) After the plans and specifications were completed and the invitation for bids based thereon was issued in February 1953, but prior to the submission of plaintiff’s bid, the officials of A. Belanger & Sons, Inc., of Cambridge, Massachusetts (hereinafter sometimes referred to as “Bel-anger”) , a firm with long experience in the sheet metal, roofing, and waterproofing business, became interested in performing the roofing work included in the project, described in finding 4. In connection therewith, three officers of the company, i.e., the president, the vice president, and the treasurer and general manager, visited the site of the project to inspect the hangar and ascertain the scope of the work. At that time many prospective bidders were surveying the site. The proposed project was, insofar as the responsibility of supervising its actual conduct at the site was concerned, vested by defendant in a “Resident Officer in Charge of Construction,” and prospective bidders were required first to report to, and register with, the Resident Officer’s office where, principally for security reasons, an escort was assigned to accompany and guide them around the station. An employee of the Department of the Navy who was stationed at the base as a construction inspector was assigned by the Resident Officer to escort prospective bidders around the project site, and during the approximate 15-day period between the issuance of the invitation for bids and the date for the opening thereof (March 3, 1953) this employee so acted as an escort or guide approximately four times a day. One of the site survey parties to which he was so assigned during this period was the Belanger party. The inspection of the hangar was made by the three officers of Belanger without the benefit of rigging or scaffolding. It consisted entirely in viewing the structure from the ground and from various points within and on it. The Belanger officials had a copy of the specifications and drawings with them at the time. Considerable areas of the large structure could not be examined closely *106 by this visual method. Nevertheless, as a result of the inspection, which took approximately an hour, they concluded that the V-beam sheets, other than those in the area where the 200 slightly damaged sheets referred to in specification sections 6-10 and 6-18 were located, were tight and in excellent condition, with only a very few other than said 200 requiring tightening or refastening. The 550 damaged and slightly damaged sheets referred to in 6-10 and 6-18 were shown by the pertinent drawing to be located around the ends of the hangar, where the large pairs of steel doors at each end were located. The drawing did not indicate any such damaged or slightly damaged sheets on the long sides of the hangar, where the great bulk of the V-beam sheets were located. However, in light of his conclusion that the vast majority of the V-beam sheets were still tight and had not loosened up during the years, including the deactivation period, one of the Belanger officers, the treasurer and general manager, expressed concern to the escort regarding the meaning and requirement of that part of the first sentence of specification section 6-10 which stated that “All V-beam roofing sheets shall be refastened * * He felt that this would be a useless requirement with respect to what he considered to be the very large number of tight sheets, and inquired of the escort what his interpretation of the specifications was, and whether the successful bidder would be required to refasten all the V-beam sheets whether or not they were tight. However, the escort replied that he could not undertake to give an interpretation of the specifications because he had not as yet read and studied them and also because, in line with standing instructions, no one was authorized to give such interpretations or to attempt to interpret specifications for contractors prior to awards except a duly authorized official. Consequently, he referred the Belanger official to the Resident Officer in Charge of Construction at the station. Despite this cautionary admonition by the escort, the Belanger officials did not refer the question to the Resident Officer in Charge, the Officer in Charge, or the Contracting Officer, for interpretation at that time or at any time prior to the commencement of the subcontract work, as hereinafter set forth.
*107 At that time, the Belanger officials had seen and were familiar with the provisions of the Invitation for Bids, including the following part of the “Instructions to Bidders” which accompanied the Invitation:
1. Explanation to Bidders. — Any explanation desired by bidders regarding the meaning or interpretation of the drawings and specifications must be requested in writing and with sufficient time allowed for a reply to reach them before the submission of their bids. Oral explanations or instructions given before the award of the contract will not be binding. Any interpretation made will be in the form of an addendum to the specifications or drawings and will be furnished to all bidders and its receipt by the bidders shall ;be acknowledged.
(b) After its investigation, but prior to the submission of plaintiff’s bid to defendant, Belanger offered to plaintiff to perform the roofing phase of the project (and certain other work) for the sum of $106,800. At the same time, Belanger made the identical proposal to all the other general contractors who likewise were contemplating submitting bids to defendant.
9. (a) Upon award of the prime contract to plaintiff, plaintiff entered into negotiations with Belanger with respect to Belanger’s bid of $106,800, the parties ultimately agreeing upon a price of $85,000. On April 22, 1953, plaintiff and Belanger entered into a subcontract for the performance of the roofing work involved in the prime contract (as well as certain other work) for said sum of $85,000. Article 2 of the subcontract stated in part :
The Subcontractor and the Contractor agree that the materials to be furnished and work to be done by the Subcontractor are furnish labor, materials, tools, equipment, staging and do all rooting * * * all in strict accordance with the plans, specifications and addenda. Booting * * * work specified in the specification under Section 6, Paragraph 6-01 to 6-20 both inclusive. * * * The intend [sic] of this contract is to provide for a complete job of roofing * * * all as specified without exception. All work must meet with the complete satisfaction of the Public Works Department [the defendant], Architect [Browne] and Jefferson Construction Co.
*108 Belanger commenced its roofing work on April 22,1958. Its last work pursuant to the subcontract was completed during the week ending February 3, 1954.
(b) The three low bids that were submitted to defendant on the project by general contractors were as follows:
Jefferson Construction Co., Inc_$663,000
Gil Wyner Co., Inc_ 664,190
National Construction Co., Inc- 669,450
As set forth in finding 8 (b.), Belanger had. also submitted proposals to the other general contractors in said amount of $106,800.
(c) The subcontract price of $85,000 was generally within the range of the estimate for the portion of the work involved that was made by Browne.
10. On May 13, 1953, an officer of the Belanger company (the treasurer and general manager) conferred at the project site with the Resident Officer in Charge of Construction and his assistant concerning approvals of materials involved in certain phases of the roofing work other than the panels or sheets. At that time, the Resident Officer inquired when the panel work on the main part of the hangar roof, being the V-beam portion, would be completed. The Belanger representative replied that good progress was being made in replacing the damaged sheets and repairing the slightly damaged sheets, and estimated that the V-beam portion of the work would be completed in approximately 2 weeks. However, the Resident Officer questioned this estimate in light of the large amount of work he considered remained to be accomplished in connection with refastening all the sheets over the entire V-beam area. Thereupon, the Belanger official stated that he had not contemplated any such operation. As a result, a discussion ensued as to the proper interpretation of the specifications and the scope of the work required thereunder, both the Resident Officer and his assistant maintaining that under the provisions of 6-10, the contractor was obliged to refasten all the V-beam sheets on the entire hangar, and the Belanger official maintaining that 6-10, read together with 6-18 and the drawings, required the contractor to refasten only the 200 sheets that were slightly damaged and which were designated as being in the limited areas set forth on the drawings. He conceded that, under the general obli *109 gation. to make tlie hangar watertight, the contractor was also obliged to refasten any other loose sheets in the structure, regardless of where they were located, but he felt there were only a trivial number of such sheets in the entire hangar. Under this interpretation, the Belanger firm proposed to do no work whatsoever upon the great bulk of the V-beam sheets in the hangar. In support of his interpretation, the Belanger official pointed out that specification section 6-09, which section he conceded should properly be interpreted as requiring the refastening of all the mansard sheets, went on to specify what type of fastener should be used in such refastening operation, and where the new fastenings should be inserted, whereas there was no such similar provision in 6-10 relating to the V-beam sheets. He felt, therefore, that there was nothing in the specifications to indicate how all the V-beam sheets were to be refastened. He considered that this was proof that the specifications did not contemplate such refastening, else they would have indicated how the work was to be done. However, defendant’s officials stated that the type of fasteners to be used and the method of fastening were set forth in section 6-11 (d) which they interpreted to apply to all of the V-beam sheets, and not only to new roofing installation work, as the Belanger official interpreted the entire section 6-11.
As a result of this conversation and dispute, the Besident Officer orally ordered the Belanger official to proceed with having all the V-beam sheets refastened in accordance with 6-10 and 6-11 (d). However, since he regarded the doing of such work to constitute extra work under the contract, the Belanger official requested that such order be given in writing.
11. As a result of the May 13, 1953, conference between the Besident Officer and the Belanger official, the Besident Officer, by memorandum dated May 14, 1953, advised the Officer in Charge of Construction of the difference in opinion concerning the proper interpretation of the specifications, and also sought advice from the Officer in Charge as to such interpretation. Said memorandum read as follows:
1. At a conference held in this office with A. Belanger & Sons, Inc., roofing subcontractor for the Jefferson Construction Co. the prime contractor under subject *110 contract, it was brought out that the roofing subcontractor has taken exception to our interpretation of Sections 6-10, 6-lld and 6-18 of subject specifications? all dealing with the extent of the work to be accomplished.
2. It is the interpretation of this office that: Section 6-10 requires all existing V-beam roofing, over and above those sheets that are to be replaced or repaired, to be refastened; Section 6-lld specifies all fastenings to be of certain types including those required for the refastening of the remaining sheets as well as the damaged and slightly damaged sheets; and that 6-18 merely expands on the requirement of that part of 6-10 dealing with the replacement or repair of the damaged and slightly damaged sheets. In line with the above interpretation, the roofing subcontractor has been ordered to proceed with the refastening of all V-beam roofing sheets on the Hangar and main door roofs.
3. The roofing subcontractor interprets those sections as dealing only with the V-beam roofing sheets listed and/or indicated on the plans as requiring replacement and/or repair.
4. In view of the above, it is requested that the Resident Officer in Charge of Construction be advised as to the firm interpretation and meaning of Sections 6-10, 6-lld and 6-18 of subject specifications.
Similarly, the subcontractor, by letter dated May 15, 1953, advised plaintiff of the dispute, and requested a written order from defendant before proceeding with the work. The letter stated as follows:
On Wednesday, May 13,19531 had a conference with Lt. Cdr. DeBelle [sic] relative to several items involving our contract on the rehabilitation of the roofing on the above project.
During the course of our conference, the subject relative to fastening of the V beam roofing, as outlined under section 6-10 and 6-18 came under discussion.
Lt. Cdr. DeBelle [sic] asked us just how we were going to proceed to do the work outlined under these two sections. I explained to him that section 6-10 outlined the work that was to be done and that section 6-18 outlined the extent and the method in which it was to be done.
In estimating the cost on the above job, we interpretated [sic] section 6-10 to mean that all sheets that were tight were not to be touched and that any sheets that were damaged or had to be repaired would have to be refastened.
*111 Lt. Cdr. DeBelle [sic] took exception to our explanation and told me that his interpretation of 6-10 and 6-18 was that we would have to install a new top speed fastener as outlined in Section 6-lld and that his verbal order was that we proceed with this immediately.
I pointed out to the Lt. Cdr. DeBelle [sic] that Section 6-lld pertained only to new work but he still insisted that we refasten all the V beam sheets on the hangar according to section 6-lld.
In view of the large amount of work involved we wish to receive decision of Lt. Cdr. DeBell in writing before we proceed with this extra work. is <]» $ í» $
By letter of May 18, 1953, plaintiff transmitted the subcontractor’s letter to the Resident Officer with the following-letter :
We enclose herewith copies of a letter received by us from our roofing subcontractor, A. Belanger & Sons, Inc., claiming additional compensation for doing all roofing work in accordance with instructions from Lt. Commander DeBell. It is their contention that the requirements from the Lt. Commander differ from those called for in the specifications and they are, therefore, requesting a written confirmation of the verbal instructions given them. They will proceed with the work under protest.
On May 26, 1953, the Resident Officer, having received advice from the Officer in Charge of his agreement with the Resident Officer’s interpretation, sent the following letter to plaintiff:
By your letter of 18 May 1953 you submitted a letter from your roofing subcontractor, A. Belanger & Sons, Incorporated, requesting formal written confirmation of the verbal orders previously given by the Resident Officer in Charge of Construction that all the V-beam roofing on the hangar being rehabilitated under subject contract was to be refastened.
You are advised that this will confirm prior verbal orders given your roofing subcontractor, namely, that all V-beam roofing connected with roofing of the Hangar, Building No. 1, being rehabilitated and repaired under subject contract is to be refastened as required by Sections 6-10 and 6-llb of subject specification as well as those portions of V-beam roofing other *112 wise specified to be replaced or repaired. This will also confirm prior verbal orders given to proceed with the work as specified.
On May 28, 1953, plaintiff forwarded the Resident Officer’s letter to the subcontractor.
12. By letter of June 5, 1953, from Belanger to plaintiff, Belanger stated that it believed the reference to 6-11 (b) in the Resident Officer’s letter of May 26 (finding 11) “was in error” and that “before we can start any work in conjunction with our letter of May 14, we want a specific letter instructing us to refasten all V-Beam roofs in accordance with paragraph 6-lld.” The letter went on to discuss 6-11 and concluded that “We feel that Lt. Cdr. DeBell’s interpretation of this refastening item of V-Beam Roofing is in error as there is no specific method indicated in the specifications or on the plans in relation to the refastening item for the V-Beam roofing sheets.” The letter closed by asking for a conference with the Officer in Charge, since “the cost of doing this refastening * * * might well approach a cost of fifty to seventy thousand dollars * * and stating:
The interpretation of this office, as included in our bid price to you, included only the refastening of the 200 sheets of the V-Beam roofing. Should the interpretation of the Office in Charge of Construction be otherwise, I request that you enter a claim for this extra labor and material involved and that this claim be forwarded to the Contracting Officer for his decision.
By letter of June 8, plaintiff forwarded to the Resident Officer in Charge the subcontractor’s letter of June 5, and the following day, June 9, the Resident Officer sent to plaintiff a letter confirming the order to refasten all the V-'beam sheets and correcting the reference to section 6-11 (b) in his letter of May 26 (finding 11) to 6-11 (d). Further, pursuant to the subcontractor’s request, a conference was had on the following day, June 10,1953, at the office of the Resident Officer between officials of the prime contractor and the subcontractor on the one hand, and several officials representing defendant on the other, including the Resident Officer and the project coordinator, at which the subcontractor’s contentions were again considered. However, defendant’s officials at the conference, in reply to the subcontractor’s *113 contentions, again took the position that specification sections 6-11 (a) to 6-11 (e) did not deal only with new roofing installation work, such as was contemplated by section 6-19; and that 6-10 and 6-18 did not deal with the identical panels, but instead, that 6-18 only dealt with the manner in which the damaged and slightly damaged sheets mentioned in a part of 6-10 were to be replaced or repaired. Thereafter, the Officer in Charge of Construction, by letter of June 19,1953, to plaintiff, advised:
^ «I» ¡f! It was the intent of this contract to have all V-beam roofing sheets refastened and it is the opinion of the Officer in Charge of Construction that the contract plans and specifications adequately describe this work. Furthermore, this office concurs with interpretation of scope of V-beam roofing work as outlines [sic] in Resident Officer in Charge of Construction letter of 12 June. Accordingly, the contractor is directed to proceed with the work of refastening V-beam roof sheets all in accordance with project specifications. This letter does not prejudice the contractor’s right to refer this dispute to the Contracting Officer as provided in Article 16 * * *. * * * * *
13. (a) On June 22,1953, plaintiff commenced the V-beam refastening work. This phase of the project operation continued for 71 working days and was completed on October 2, 1953. Additional exterior rigging was constructed and new top-speed fasteners were inserted on the outside around the perimeters of the sheets where they overlapped. In addition the fasteners were inserted through the sheets and directly into the purlins, which had the effect described in finding 7(a). As a result, plaintiff refastened approximately 14,000 V-beam sheets over and above the approximately 200 slightly damaged sheets it concedes it was obligated to refasten under the plans and specifications, and the damaged sheets which it also concedes it was obligated to replace and fasten.
(b) Assuming that the specifications, properly construed, required a fastening or refastening operation on all of the V-beam sheets, the insertion of the new top-speed fasteners in accordance with the method outlined in specification sec *114 tion 6-11(d), which, was the method directed by defendant and employed by plaintiff, was, on an overall basis, more economical, or at least not more costly, than examining and refastening the existing fasteners would have been, since inspecting and tightening up all of the existing nuts and bolts and replacing any that were missing would have involved expensive interior and exterior rigging as well as workmen on both the inside and the outside of the structure, as described in finding 7(a).
(c) In performing its subcontract, Belanger refastened all of the mansard sheets. Plaintiff concedes that it was its obligation to refasten all of such sheets pursuant to specification section 6-09 and there is therefore no controversy with respect to this phase of the work. Most of these sheets, having been nailed into wood planking, were loose. The record does not disclose how many V-beam sheets were in fact so tight as not to require refastening. Neither plaintiff nor defendant ever made a detailed sheet-by-sheet examination to so determine, nor made any other kind of adequate examination that would produce an accurate determination of such number. As set forth in finding 7, such a detailed examination would be extremely costly. It was for this reason that defendant chose the top-speed fastener method for all the sheets, considering such operation more economical. However, a substantial number of V-beam sheets were in fact loose and required tightening.
14. (a) By letter of July 14, 1953, plaintiff presented a claim in the amount of $97,162.81 for the refastening of the V-beam panels as ordered by the Officer in Charge. However, at that time, as shown by finding 13, the work was still in its early stages. In support of its claim, plaintiff stated:
* * * The Resident Officer in Charge of Construction contends that the re-fastening of this material is a contract requirement. It is our contention that Section 6-10 outlines the work that is to be done and that Section 6-18 outlines the extent and the intent of the work which is to be accomplished. The subcontractor figuring this portion of the work interprets Section 6-10 to mean that all sheets are to be replaced or repaired and that any material that was damaged or was loose would be re-fastened. Lieutenant Commander DeBell took exception to this explanation and ruled that Paragraphs *115 6-10 aucl 6-18 were intended to include new top speed fasteners as outlined in Section 6-lld and that the entire roof would require a re-fastening job.
It is our contention that Section 6-lld pertained only to new work. Paragraph 6-18 indicates the quantity of work to be done and states, in part “V-beam roofing shall be repaired or replaced in areas indicated on the drawings”. You will note that Paragraph 6-10 titled “V-beam Hoofing” indicates that 350 sheets are to be replaced and approximately 250 are to be repaired. This paragraph is further clarified in Paragraph 6-18 which then tells the extent of the work to be done in Paragraph 6-10.
Lt. Commander DeBell’s interpretation of this V-beam roofing and the opinion of our subcontractor are in error as there is no specific method indicated in the specifications or on the plans in relation to the re-fastenmg item for V-beam roofing sheets.
In view of the fact that the cost for doing this re-fastening work might well be $70,000 to $90,000, we would appreciate an immediate reply to this claim. The intent of this office in presenting a bid for this job with regard to the V-beam roofing was to re-fasten approximately 200 sheets. jfc tj: :ji íJj
The “breakdown” of the claim showed $67,682.50 as the subcontractor’s direct expense. To this was added 15 percent ($10,152.38) and 6 percent ($4,670.09) as the subcontractor’s overhead and profit, respectively, making a total of $82,504.97 for the subcontractor. To this sum was added 10 percent ($8,250.50), 6 percent ($5,445.33) and 1 percent ($962.01) for plaintiff’s overhead, profit, and bond, respectively, bringing the total amount to $97,162.81.
(b) By letter of May 27,1954, the Contracting Officer denied the claim presented as set forth above. The letter stated:
The Bureau has carefully reviewed your claim for additional compensation in the sum of $97,162.81 under Contract NOy-73792 (Spec. No. 34833) Naval Auxiliary Landing Field, South Weymouth, Massachusetts.
It would appear that your claim is based on the position that the contract did not require you to refasten certain sheets of V-beam roofing and siding, and that you are therefore entitled to additional compensation if directed to include the refastening of these sheets. However, *116 section 6-10 of the contract specification specifically states that “All V-beam roofing sheets shall be refastened.” It is not considered that other pertinent sections of the specification reduce or alter the scope of this clearly indicated requirement.
Your request for additional compensation must therefore be denied. This is a final decision of the Contracting Officer.
15. (a) By letter of June 2, 1954, plaintiff, in accordance with the provisions of Article 16 of the contract (finding 3), appealed the decision of the Contracting Officer to the Secretary of the Navy, stating “We feel that the re-fastening of the V-Beam roofing * * * is over and above the contract requirements * * *.” After a hearing before the Navy Contract Appeals Panel, Armed Services Board of Contract Appeals, to which the matter was referred, which commenced on November 29, 1955, and ended on December 1, 1955, and at which hearing witnesses for both the contractor and the defendant were heard and exhibits introduced, the Panel, by an opinion dated June 20, 1957, upheld the decision of the Contracting Officer and denied the appeal. The exhaustive opinion reviewed all of the contentions of both parties and, in elaborate detail, the various provisions of the specifications involved in such contentions. The Panel concluded that the provisions of 6-10, both in themselves as well as in the context of the other specifications, were clear in providing the refastening of all V-beam panels and not only the 200 slightly damaged panels referred to in 6-18. It further found that there was insufficient “evidence of surrounding circumstances”, including the alleged understanding of the subcontractor resulting from its site investigation, as well as the alleged intent of the defendant as manifested by the purpose of the project, which would serve to alter this interpretation of the specifications.
(b) In its petition filed herein on March 31, 1958, as amended, in which plaintiff reduced its claim to $80,889.91, plaintiff alleges that said decision is arbitrary and capricious, and not supported by substantial evidence. This allegation cannot be sustained. On the basis of the testimony and exhibits before the Appeals Board, as well as the trial proceedings before this court, including the introduction of *117 further testimony and exhibits, the Board’s conclusion is supported by substantial evidence and is neither arbitrary nor capricious.
16. Upon the completion of all of the subcontractor’s work, including the refastening of all the V-beam sheets, the subcontractor, in order to receive its final payment from plaintiff, executed a release to plaintiff. The release was subsequently misplaced or lost and could not be introduced in evidence, so that the terms thereof are unknown. Despite the giving of this release, plaintiff in the trial proceedings before this court, openly acknowledged its liability to its subcontractor Belanger for the excess costs incurred by Belanger in complying with the direction of defendant’s officials with respect to refastening all of the V-beam sheets.
17. The extra costs and expenses incurred by the subcontractor that were directly attributable to the refastening of all the V-beam sheets in accordance with defendant’s instructions and based on defendant’s interpretation of specification sections 6-10 and 6-11 (d) (exclusive of the approximately 200 that were slightly damaged, as set forth in specification section 6-18 and the drawings) were $43,-958.92, composed of the following items:
Labor_$22,124.93
Workmen’s Compensation (12% of labor)_ 2,654.99
Materials_ 7,122.54
Staging — Rental Value 71 days @ $11.60 per day- 823.60
Travel Expense_ 90.75
Overhead (50.36% of labor)_ 11,142.11 43, 958. 92
Had such amount been included in a change order under Article 10 of the contract (finding 3) the equitable adjustment made in connection therewith would have also included 6 percent as profit. On the above cost basis, the amount of the profit that would have been so included is $2,628.54. Thus the total amount of the change order to cover this additional operation would, on this basis, have been $46,587.46.
As set forth in finding 14(a), the claim plaintiff presented to the Contracting Officer included 10 percent for plaintiff’s overhead and 1 percent for plaintiff’s bond. The evidence presented at the trial in this court fails to sustain any amounts for such items. Said Article 10 provides that the *118 Contracting Officer may, in his “discretion” make allowances “for overhead and general expenses, plant rental, and other similar items.”
18. (a) For performing all of the work performed by it under the subcontract, including the V-beam sheet refastening work herein involved, Belanger received from plaintiff the amount of $84,366.29. In addition, although specification sections 6-10 and 6-18 indicated that approximately 350 damaged V-beam sheets were to be replaced, it turned out that only 116 such sheets required replacement and were replaced. Accordingly, the subcontractor returned the approximately 234 unused sheets to the supplier and received a credit in some undisclosed amount for them. Similarly, the subcontractor gave a credit to plaintiff for such 234 sheets, the amount of said credit also not being disclosed by the record. However, no credit for such sheets were ever given to defendant by plaintiff.
In the total performance of its subcontract, including the V-beam sheet refastening operation, the subcontractor expended the total sum of $87,231.12. Thus, excluding any credits received for unused V-beam sheets, the subcontractor incurred a loss of $2,865.43.
(b) Were plaintiff to recover the sum of $46,587.46 for the refastening work herein involved, and if $43,958.92 thereof were to be paid to the subcontractor, being the actual amount expended therefor by the subcontractor, as set forth in finding 17, without any specific item for profit allocated thereto, the total amount that would be then received by the subcontractor for all of its work performed on the subcontract would be $128,325.21 (84,366.29+43,958.92). Since the subcontractor expended $87,231.72 on its subcontract operations, it would on this basis realize a profit of $40,093.49, being approximately 30 percent of the total amount received, and approximately 45 percent of its total costs.
CONCLUSION OR LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and its petition will be dismissed.