Littleton, Judge,
delivered tbe opinion of tbe conrt:
Plaintiff, a partnership engaged in tbe construction business, bas brought this action to recover additional costs in the sum of $4,415.60 alleged to be due for extra work performed under a contract with the United States acting through the Pish and Wildlife Service of the Department of the Interior. Plaintiff was awarded the contract on the basis of having submitted the lowest bid in the amount of $257,600. The contract provided for the construction of additional fish cultural facilities at the U. S. Fish Cultural Station in the vicinity of Carson, Washington. Among the facilities to be constructed were rearing ponds, the bottom of which were to be concrete slabs. The dispute here involves the type of gravel to be used beneath the slabs which gravel, together with the several lines of drain title to be embedded in it, was to provide for the drainage of ground water beneath the ponds. With respect to this item the contract specifications provided:
Concrete Slabs. * * * Several inches of gravel shall then be tamped into the surface of this subgrade; after which the remainder of the gravel cushion shall be placed and thoroughly saturated with water.
Drain Tile. * * * All drain tile shall be laid within the prepared gravel fill to the lines and grades as shown. * * * Tile shall be laid on a firm even bed with 14-inch open joints.
Plaintiff sought to use for this purpose gravel obtained from a sandbar in the river adjacent to the construction site. The Government refused to permit the use of gravel from that source unless both the fine and coarse materials were screened out. The Government engineer had determined that use of the sandbar material in its natural state was not the type of gravel contemplated or called for under the contract and that such use would only serve to clog the drainage system beneath the concrete slabs.
Plaintiff did install a screening device known as a grizzly which only screened out coarse material in excess of three inches in diameter. It took the position that the velocity of the flow beneath the slabs would not be rapid enough to carry off the fines in such a way as to cause any stoppage in *731 the drain tiles. In addition, plaintiff made two further suggestions to assure no blockage: first, that screen be wrapped around each tile joint, and, second, that access cleanouts be provided at the end of each branch drain.
The engineer-in-charge rejected this method of procedure stating:
All drain tile shall be laid within the “prepared gravel” fill to the lines and grades shown. Prepared gravel is generally defined and accepted among those dealing in this product as a coarse granular material larger than 0.187 inches * * * free of dirt, dust, loam, or foreign materials, and graded to size, and when used as porous backfill for subgrade drainage purposes shall be evenly graded from 3" to and contain not more than 10 percent of fine materials passing a No. 4 sieve. * * *
It will be necessary that the construction work under the subject contract be performed in strict accordance with the plans and specifications and that materials used in the construction meet specifications and serve the purpose for which they are intended. We see no need for revision of specifications for “under drainage” material, estimates, or extra work orders at this time, as we contend that the specifications and construction plans clearly specify the various types of gravel material required to serve the purpose for which they were intended.
Plaintiff concluded that it would not be economical or feasible to screen out both the fines and the coarse material as required by the engineer. It therefore purchased the gravel from a supplier 40 miles distant from the construction. Then, on the alleged basis of having submitted its bid based on the premise that local gravel could be used, plaintiff made claim on the Government for the cost of obtaining the gravel as an extra cost under Article 3 of the contract.
The contracting officer in response to that claim rendered findings supporting the position taken by the engineer and denied the claim. On plaintiff’s appeal to the head of the department as provided for in the standard disputes clause of the contract, the decision of the contracting officer was affirmed.
Here plaintiff seeks recovery on two grounds. First, plaintiff states that upon inspection of the construction site *732 prior to the submission of its bid, it was told by Mr. Cannady, Superintendent of the U. S. Fish. Cultural Station, whom the invitation to bid had directed it to contact, that use of the sandbar material as gravel beneath the ponds would be acceptable. Second, plaintiff argues that the decision of the head of the department under Article 15 of the contract upholding the engineer’s conclusion that the sandbar material was unsuitable in the absence of adequate screening, was arbitrary, capricious, or erroneous and was not supported by substantial evidence.
Mr. Cannady had no authority whatsoever with respect to the question of what materials would or would not be acceptable under the proposed construction project. Plaintiff’s reliance on the language of the invitation for bids as vesting Mr. Cannady with such authority is misplaced. The invitation stated as follows:
Prospective bidders may inspect the work site by arrangement with Mr. Bruce Cannady, Superintendent of the Carson U. S. Fish Cultural Station.
This provision merely indicated that would-be bidders desiring to inspect the work site might make the necessary arrangements for such inspection with Mr. Cannady. It falls far short of giving notice that Mr. Cannady was the individual with authority to pass on the suitability of materials. The invitation in other provisions (finding 2) is quite clear in stating that it is the “Engineer” who is vested with authority to make such decisions. Plaintiffs knew that Mr. Cannady was not the engineer and have acknowledged that fact here. Thus, assuming plaintiff’s assertions with respect to the information given it by Mr. Cannady to be correct, plaintiff knew at the time that Mr. Cannady lacked authority to bind the Government with respect to the materials to be used under this contract. The trial commissioner was correct in his refusal to make findings on this point, and plaintiff’s exceptions therefore are not pertinent.
When the contract provisions in issue are read in the light of the contract as a whole and the type of work contemplated, it is apparent that the gravel required in order to assure the proper operation of the drainage system beneath the ponds had to be of the quality required by the Government’s *733 engineer. Plaintiff itself, we believe, recognized that the sandbar material contained lines which might canse stoppage when it suggested that the tile joints be wrapped with screens. The fact that the tile joints themselves were expressly required to have % inch clearance indicated that the gravel to be used could not contain any appreciable amount of material less than % inch in size.
Then, too, the contract specifications themselves in speaking of gravel to be used in the grading of roadways and parking areas, specifically mentioned “local river gravel” and “river gravel.” The same specifications with respect to the cushion for the concrete slabs speaks of “gravel” and “prepared gravel.”
In addition, the head of the department had before him further evidence with respect to the tests run on the sandbar material which was not before either the engineer or the contracting officer. Those tests showed that, with respect to one sample 21 percent and another sample 33.4 percent, represented fines capable of entering the drainage system and served to confirm the position taken by the engineer and the contracting officer.
We are of the opinion that there has been no showing of arbitrary or capricious action with respect to the decision by the head of the department, and we conclude that his decision was based upon substantial evidence.
Plaintiff is not entitled to recover and its petition will be dismissed.
It is so ordered.
Laramore, Judge; Madden, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
EINDINGS OE PACT
The court, having considered the evidence, the report of Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff, a partnership engaged in the construction business, was during the times material herein composed of Kenneth Ward Anderson and his father, Joseph H. Anderson. After this action was filed, Joseph II. Anderson died *734 and Kenneth Ward Anderson has duly qualified and is now acting as executor of the estate of the deceased. The principal office of the plaintiff is and for many years has been at Vancouver, Washington.
2. In 1952, the Department of the Interior, through its Fish and Wildlife Service, Swan Island, Portland, Oregon invited bids for the construction of additions to the U. S. Fish Cultural Station near Carson, Washington. Included in the invitation was the following:
BIDDING SCHEDULE
Invitation No. FW1-3234
Construction of Fish Cultural Facilities
IT. S. Fish Cultural Station, Carson, Washington
Before submitting bids, bidders should read carefully Government Standard Forms Nos. 20 to 25A, inclusive (available at the offices named in this invitation), drawings, specifications, and detailed requirements concerning construction; visit the site of the proposed work and familiarize themselves with the local conditions affecting the work. The offering of a bid shall constitute a waiver on the part of the contractor of all claims for extra compensation on account of his failure to make examination and investigations.
Bids for the construction under this invitation in accordance with the attached General Conditions, Special Conditions, Specifications and Drawings will be considered on the following schedule.
sje sf* # ❖
GENERAL CONDITIONS
$ $ $ $ *
Section 16 — Authoeity op the Engineee
The Engineer shall decide any and all questions which may arise as' to the quality and acceptability of materials furnished and work performed, the manner of performance and the rate of progress, interpretation of the plans and specifications, and acceptable fulfillment of the terms of the contract.
Section 21 — Mateeials
All materials of every description, unless otherwise provided, shall be furnished by the Contractor. Only materials conforming to the requirements of these speci *735 fications shall be used in the work. All tests of materials shall be made by the Engineer in accordance with approved methods as described and designated in these specifications. When tests of materials are necessary they shall be made at the expense of the Government unless otherwise provided. The Contractor shall afford such facilities as the Engineer may require for collecting and forwarding samples, and shall hold the materials represented by the samples until tests have been made and the materials found equal to the requirements of the specifications or to approved samples. The Contractor shall furnish the required samples without charge.
SPECIAL CONDITIONS
Invitation No. FW1-3234
1. DESCRIPTION OF WORK: INSPECTION OF SITE
$ ‡ ‡ ‡
Prospective bidders may inspect the work site by arrangement with Mr. Bruce Cannady, Superintendent of the Carson U. S. Fish Cultural Station.
❖ # # * ❖
Bid openings were set for November 6, 1952. This date was changed to November 17, 1952, and bids were opened at the agency office at Swan Island, Portland, Oregon.
3. The U. S. Fish Cultural Station, the site of the proposed construction, was located between and immediately adjacent to both the Wind River and Tyee Creek about 65 miles east of Portland, Oregon and about 14 miles northwest of Carson, Washington. The site was in the State of Washington.
4. The plaintiff submitted a bid, was the successful bidder and was, on December 3, 1952, awarded the contract for the work at a fixed price of $257,600. Work was to be commenced within 10 days from receipt of notice to proceed and was to be completed within 240 days thereafter. Liquidated damages of $225 per day were provided for each calendar day of delay.
5. The contract is in evidence as plaintiff’s exhibit No. 2 and is incorporated herein by reference. It was executed on behalf of the defendant by Henry Baetkey, Chief, Branch of Finance and Procurement of the Fish and Wildlife Serv *736 ive, Department of the Interior, as contracting officer. Both partners signed the contract on behalf of the plaintiff. It contains the following provisions, among others:
* £ # % i¡t
Article 2. Specifications and- drawings. — * * * In any case of discrepancy in the figures, drawings, or specifications, the matter shall be immediately submitted to the contracting officer, without whose decision said discrepancy shall not be adjusted by the contractor, save only at his own risk and expense. * * *
Article 3. Changes. — The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. * * * If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in article 15 hereof.
*****
Article 6. Inspection. — (a) All material and workmanship (if not otherwise designated by the specifications) shall be subject to inspection, examination, and test by Government inspectors at any and all times during manufacture and/or construction and at any and all places where such manufacture and/or construction are carried on. The Government shall have the right to reject defective material and workmanship or require its correction. * * *
Article 7. Materials and workmanship. — Unless otherwise specifically provided for in the specifications, all workmanship, equipment, materials, and articles incorporated in the work covered by this contract are to be of the best grade of their respective kinds for the purpose. * * * When required by the specifications, or when called for by the contracting officer, the contractor shall furnish the contracting officer for approval full information concerning the materials or articles which he contemplates incorporating in the work. * * *
* • * * * if:
Article 15. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written *737 appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto. * * *
‡ ‡ Hi
Article 21. Definitions. — (a) The term “head of the department” as used herein shall mean the head or any assistant head of the executive department or independent establishment involved, and the term “his duly authorized representative” shall mean any person authorized to act for him other than the contracting officer.
(b) The term “contracting officer” as used herein shall include his duly appointed successor or his authorized representative.
* $ $ ‡ $
6. Technical Specifications provide in part as follows:
Section 1 — GENERAL
The following general description of the work to be performed under the contract is for the convenience of the contractor. Any omission of any particular phase or portion of work does not in any way relieve the contractor of completion of all work shown on the drawings or mentioned in the specifications. All work has been grouped under one bid item and the general contractor will be held responsible for the inclusion and completion of all interlocking work.
a. Intake and control structures consist of reinforced concrete structures complete as shown with gates, racks, miscellaneous steel and wood items, on Wind River, Tyee Springs and Tyee Creek.
b. Rearing and holding ponds consist of reinforced concrete, complete as shown, with all drains, piping, gates, screens, racks and miscellaneous items.
$ ‡ *
k. Grading and roads consist of leveling off the ground to elevations shown, making fill, and constructing the roads with 6 inches of local river gravel, crowned and ditched for drainage, and leveling and surfacing the parking area.
*****
Section 3 — EARTH W ORK
* * * * *
Grading. The contractor shall grade the roadways, parking area and 10 feet around the structures to the *738 grade indicated. The roadways and parking area shall be surfaced with river gravel passing a iy2" screen, to a depth of 6", leveled and compacted. The entire construction area shall be left in a well dressed, clean condition.
*****
Section 4 — CONCRETE
*****
Concrete Slabs. Excavating and/or filling for concrete slabs shall be made to the elevation indicated on the drawings and the earth brought to an even surface and well tamped to provide a firm, even bearing. Several inches of gravel shall then be tamped into the surface of this subgrade; after which the remainder of the gravel cushion shall be placed and thoroughly saturated with water. Prior to placing the floor slab the surface shall be tamped ana leveled to the proper elevation.
Drain Tile. Drain tile shall be either hard-burned clay, or concrete, and shall conform to A. S. T. M. Specification Designation C4-24 for the “Extra Quality Drain Title.” The wall thickness shall not be less than y2 inch.
All drain tile shall be laid within the prepared gravel fill to the lines and grades as shown. No damaged title shall be used. Tile shall be laid on a firm even bed with % inch open joints. All tile shall be inspected in place by the engineer, prior to covering the tile with gravel to the grades shown.
$ $ $ ^ ^
Composition and Mix. It is intended under these specifications to provide for securing concrete masonry with the greatest density which may be made with the material available. For this reason, it is required that the contractor shall be governed in proportioning the materials by the measurements outlined from time to time by the Engineer as the work progresses, The strength of concrete shall be fixed in terms of the water cement ratio as determined by established results with 6 gallons of water for each sack of cement, giving a compressive strength when tested damp of at least 3,000 pounds per square inch at 28 days.
The proportions of aggregates to cement for concrete of any water cement ratio shall be such as to produce concrete that will readily work into the corners and angles of the forms ana around the reinforce *739 ment without excessive puddling or spading and without permitting the materials to segregate or free water to collect on the surface. The combined aggregate shall be of such composition of sizes that, when separated by the No. 4 standard sieve, the weight retained on the sieve shall not be less than one-half nor more than two-thirds of the total, nor shall the amount of coarse material be such as to produce harshness in placing or honeycombing in the structure. For purposes of estimating the quantities of material, the proportions are assumed to be 1 cu. ft. cement, 2.25 cu. ft. fine aggregate, 3.25 cu. ft. coarse aggregate, 6 gallons water. The consistency shall be such that the slump in testing shall be not less than 3 inches nor more than 6 inches.
iji ❖ ❖
Aggregates. All aggregates used under these specifications shall conform as to definition, chemical and physical properties, to the requirements under Grade A of IT. S. Government and Federal Specifications for “Aggregate; (for) Portland Cement Concrete” (SSA-281a), with revisions to date. Coarse aggregate shall be No. 4 screen to 1% inches graded crushed rock (with elongated slivers limited to 15%) or washed river gravel from an approved commercial plant.
* $ * * $
7. The Eegional Director of Eegion 1 had been delegated authority as the authorized representative of the contracting officer. On January 6, 1953, the acting regional director sent a letter to the plaintiff by registered mail, with return receipt requested, a copy of which was acknowledged as received by the plaintiff company on January 9, 1953. The letter reads as follows:
Eeference is made to Contract No. 14-19-008-2067 awarded to your firm covering the construction of a service building, raceway ponds, holding ponds, water supply lines, intake structures, and related work at the U. S. Fish Cultural Station, Carson, Washington.
In accordance with the provisions of this contract, you are hereby notified and directed to proceed with the work required within ten calendar days from the date of receipt of this notice to proceed, and your attention is further invited to the requirement of such contract that the work be completed within 240 calendar days after receipt of this notice to proceed.
*740 I hereby designate Mr. Arthur G. Huey, Regional Engineer, of this office or his authorized representative, as Engineer in charge under whose direction the work is to be performed.
Further, I designate Mr. Craig Redman, Construction Management Engineer, as Inspector of this contract who is to make necessary inspection of the work performed and of the materials furnished.
Please acknowledge receipt of this communication by dating, signing, and returning duplicate hereto.
8. On February 27,1953 the plaintiff was advised, by letter, that Mr. Anthony Opstedal was designated as inspector in place of Mr. Craig Redman.
9. As the work on the contract progressed, Joseph H. Anderson and Kenneth Ward Anderson inquired about May 5, 1953, of Mr. Emil S. Pearson, the Assistant Regional Engineer, concerning the suitability of certain gravel as found on a bar in the Wind River shown on the contract plans as sandbar near the construction site. While there is a dispute as to the discussion had between these individuals, Mr. Pearson’s version is accepted as true that he told the Ander-sons that they might use. the gravel from the sandbar if the gravel was screened to eliminate that which was too coarse as well as that which was too fine. Mr. Pearson also suggested that the Andersons dig some test pits before going to the expense of providing screening devices which might be required. About two weeks later Mr. Pearson was at the site of the work where he observed the erection of what is called a grizzly, a screening device which was so constructed that only the coarse material over three inches in diameter would be eliminated. Pearson further observed some test pits. From his observation of the test pits he concluded that the material contained too much fines and silt. Since neither of the Andersons was at the site of the work at that time, Pearson telephoned the younger Mr. Anderson on the next day. He said that the screening device was not suitable, since it would not eliminate the fines. After further discussions between Pearson and Kenneth Ward Anderson, on May 23,1953, the following letter was written to the regional office by the plaintiff company signed by Joseph H. Anderson:
*741 Reference is made to telephone conversation with Mr. Pearson of your office on May 20, regarding the gravel fill under the rearing ponds.
We are unable to find any classification for this material other than the general term gravel as shown on the drawings. The specifications offer no further description of this material. We did agree to limit size of material to 3" minus. However, in the case of the roads the use of local material is specified. It would seem therefore that the economy of local material was desired in the design and it was upon this basis we made our bid.
It is our belief that the material from the Wind River gravel bar will perform the function desired. An examination of the bar will show a large quantity of seepage through it. In fact the entire stream between the hatchery and the gravel bar is seepage through this bar. We believe the velocity of the flow under the slab cannot become rapid enough to carry off the fines in the bar material due to the fact that the drain pipes will not carry enough water and are the limit of flow of the system. If the velocity or current of water would become great enough to wash the fines out of the gravel, then the silt below would be washed into the gravel also. Pourous [sic] material would allow the silt to block both the gravel drains and the pipes. On the other hand gravel with enough fines will prevent carrying of the silt. In other words the fines act as a filter.
To assure that blockage of pipes will not occur, we would suggest two items: 1. Wrap screen aromad each tile joint. 2. Provide access cleanouts at the end of each branch drain. The covers for the access cleanouts could be designed in the manner of a relief soft plug, to relieve any pressure developed under the slab, thereby serving a dual purpose.
The last two paragraphs are merely ideas and suggestions that developed in our discussions fo [sic] the underdrainage subject and are mentioned only as they might be helpful.
If you desire to add to the specifications for the under-drainage material, we will be glad to submit an estimate of the extra cost.
10. In reply to the letter quoted in the preceding finding Mr. Pearson and his superior, Mr. Huey, prepared the following letter dated May 26, 1953 which was mailed to the *742 plaintiff company over the signature of the acting regional director:
Beference is made to your letter of May 23, 1953 in regard to the gravel fill required beneath the rearing pond floor slab at the Carson Fish Cultural Station being constructed under Contract No. 14rl9-008-2087. Your suggestions and discussions with respect to the type of material to be used as a cushion under the concrete slabs of the raceways have been reviewed in this office and we find that we cannot concur with your proposals and/or recommendations with respect to material.
Gravel is a general description of a coarse, granular material, the gradations of which vary with the purpose to which the material is to be used. These gradations have been specified in general throughout the contract specifications and are pointed out as follows:
a. The roadways and parking areas shall be surfaced with river gravel passing a V/2" screen. Gravel material used for road surfacing is commonly known to consist of material ranging from the specified maximum, evenly graded down to the No. 4 sieve, and containing not more than 30 per cent fines that will pass the No. 4 sieve to act as binder for surfacing materials.
b. All drain tile shall be laid within the “prepared gravel” fill to the lines and grades shown. Prepared travel is generally defined and accepted among those ealing in this product as a coarse granular material larger than 0.187 inches (No. 8 screen) resulting from the reduction of rock by the action of the elements or by crushing, free of dirt, dust, loam, or foreign materials, and graded to size, and when used as porous back-fill for subgrade drainage purposes shall be evenly graded from 3" to 14" and contain not more than 10 per cent of fine materials passing a No. 4 sieve.
c.Bedding and backfill around pipelines shall consist of soil, sand, or fine gravel. We have previously verbally indicated to you that we would prefer soil or sand to be used for the backfill about pipelines but that we would favorably consider a gravel backfill, washed into place, that contained no rock or individual particles greater than 3 inches in size. The fines for backfill of this nature would have to be of sufficient quantity to provide for the filling of all voids created through the use of the coarser aggregate.
The material required for roadway and parking area surfacing is not similar to the graded or prepared gravel *743 required for cushions under floor slabs or sub-grade drainage and backfill adjacent to pipes as is specifically-required in the specifications. We, therefore, indicated in the contract specifications that materials for roadway and parking area surfacing shall be secured from a river gravel pit in order to provide sand for the purpose of binder which is not required nor desirable for subgrade drainage backfill below raceway pond slabs.
We cannot concur with your suggestion of using screen around each tile joint to prevent the fines, of the proposed cleanouts for the removal of the fines in case they are collected within the tile drainage system.
It will be necessary that the construction work under the subject contract be performed in strict accordance with the plans and specifications and that materials used in the construction meet specifications and serve the purpose for which they are intended. We see no need for revision of specifications for “under drainage” material, estimates, or extra work orders at this time, as we contend that the specifications and construction plans clearly specify the various types of gravel material required to serve the purpose for which they were intended. We realize that you desire to complete the construction under the subject contract in the most economical manner possible; however, it is not possible under the contract specifications to permit you to use ungraded or unprepared gravel for uses contrary to specifications.
11. No sample of gravel which the plaintiff desired to use under the concrete slabs had been submitted to the defendant for testing prior to the above exchange of letters. Thereafter, on May 28, 1953, which was two days after the date of the letter by the acting regional director set forth in finding 10, the Andersons took six samples of material from the sandbar to the Northwest Testing Laboratories, an independent testing laboratory, for a screen analysis. The project inspector refused upon plaintiff’s request to participate in the selection of the samples.
12. Apparently one of the samples which had been submitted to the Northwest Testing Laboratories was marked “close to bank” and the other “outer bar” by the plaintiff. The sample marked “close to bank” on screen analysis showed that 21 percent passed a No. 4 screen which has four openings to the inch but with the thickness of the wire considered each opening is 0.185 of an inch wide. Seventy-nine per *744 cent was retained on the No. 4 screen. The sample marked “outer bar” showed 33.4 percent passed a No. 4 screen with 66.6 percent being retained.
13. The plaintiff concluded that it would not be economical or feasible to screen out both the coarse material in excess of three inches as well as the fines smaller than one-quarter inch. It therefore purchased gravel from a supplier 40 miles distant from the site at a delivered cost of $4.25 per cubic yard. This gravel was acceptable to the engineer and was used under the concrete slabs in the rearing ponds as well as under the other structures.
14. The work was completed and accepted on November 10, 1953. On November 20,1953 the plaintiff wrote a letter listing what were therein referred to as “extra charges” as an additional cost under the contract which so far as herein material is quoted below:
Account change in requirement for drain gravel under floors and slabs per our letter of May 23,1953:
791 cu. yds. gravel @ $5.00_$3, 955. 00
Spreading 20 hrs. dozer work_ 180. 00
4,135.00
Credit, 791 cu. yds. @ 800 per cu. yd. in place according to contract_ 632. 80
3, 502.20
15% per contract- 525.33
4, 027. 53
15.On December 18, 1953, the acting regional director of the Fish and Wildlife Service issued findings of fact on the plaintiff’s claim which is quoted in part below:
The Contractor claims that the specifications for gravel under the concrete floor slabs and ponds were not clearly stated and that he intended to furnish material from the river bed which, he contended, would be suitable. However, the substance that he proposed to furnish was predominately silt and sand which would restrict the flow of water since the undercourse was required for drainage. The drawings plainly showed that gravel was to be used under the floor slabs and ponds, and also showed drain tile placed at intervals of 30 feet. The Contractor, in his letter of May 23, 1953, admitted *745 that be was aware that the material in the gravel bar in the river would restrict the flow of water since he_ requested permission to wrap fine screens around the joints of drain tile to keep silt from washing through the drain. The material from Wind Eiver would have been acceptable if the fines, smaller than Vs" and the coarse matter, larger than 3", were screened out. This Service advised the Contractor by letter, dated May 26, that the gravel required would be material predominately larger than
There can be no misunderstanding as to the meaning of the term gravel since the engineering and construction trade refers to the size of the material rather than to the composition. A few definitions, as taken from accepted reference books, are as follows:
a. From “Engineering Properties of Soils,” by Hogen-togler, gravel is defined as, “particles retained on the No. 10 (2-mm) sieve.”
b. From “Field Practice,” handbook by E. E. Seelye, gravel is defined as, “rock grains — over %0." in size.”
c. From “Civil Engineering Handbook,” by L. C. Urguhart, gravel is defined as, “rock particles — 0.25 to 2.5 inches predominating.”
In no reference book is material which contains a predominate amount of fine sand and silt referred to as gravel. The material proposed for use by the Contract was predominately finer than 14" in size, and the amount that would pass a yy screen would contain a predominate amount of fine sand and silt that would pass a y10" screen. The specifications with regard to the rearing and holding ponds read as follows:
“Bearing and holding ponds consist of reinforced concrete, complete as shown, with all drains, piping, gates, screens, racks, and miscellaneous items. Concrete slabs— “Several inches of gravel shall then be tamped into the surface of the subgrade; after which the remainder of the gravel cushion shall be placed and thoroughly saturated with water.”
❖ ❖ * # *
The claim requested by the Contractor under his letter of November 20,1953, is denied in its entitety [sic].
16. The plaintiff, on January 26,1954, wrote a letter to the U. S. Department of the Interior, Fish and Wildlife Service to the attention of Henry Baetkey, Chief Branch of Finance and Procurement. It was regarded by that department as the appeal from the decision of the contracting officer.
*746 There was appended to this communication a copy of a letter dated May 29, 1953 to the plaintiff from the Northwest Testing Laboratories showing the result of screen analysis of two samples of bank run gravel which showed:
Close to Outer Percent less than 3 inches, but more than bank bar
.185 inch_ 79 60. 6
Retained on No-. 4 screen- 21 33.4
On October 6,1954, the acting solicitor, Department of the Interior, by authority delegated to him by the Secretary of the Interior, affirmed the decision of the contracting officer as to the item of an extra for gravel.
17. The plaintiff knew, and the drawings and specifications show, that the concrete slabs under the two banks of rearing ponds, each of which was 80 x 144 feet in area, called for 11 lines of 4-inch drain tile with each line extending 144 feet under the rearing ponds spaced at about 15-foot intervals with one-quarter inch open joints between each piece of tile. Each of the 11 lines was connected to a line of 6-inch drain tile extending along one end of the two banks of rearing ponds and then back to the Wind Liver.
18. No finding is made concerning conversations concerning the use of gravel which the plaintiff claims took place between Mr. Bruce Cannady and the Andersons prior to the submission of the bid by the plaintiff. Mr. Cannady was not the engineer referred to in Section 16 of the General Conditions of both the invitation to bid and also the contract. The Andersons knew he was not the engineer.
19. The parties have stipulated that the plaintiff paid its supplier $3,361.75 for 791 cubic yards of gravel used under the rearing ponds and other areas, and that the plaintiff’s books show the following other costs in connection with the placement of this gravel:
18 hours of bulldozer work at $9.00_ $162.00
298 hours of labor at $2.50_ 745. 00
70 hours of carpenter labor at $2.91_ 203. 70
1,110. 70
It is noted that in the plaintiff’s request for a change order (see finding 14) no mention was made of additional labor *747 item or carpenters’ labor. Accordingly the computation of its damages is as follows:
Cost of 791 cu. yds. prepared gravel_$3,361. 76
18 hours bulldozer work at $9.00- 162. 00
3,523.76
Credit 791 eu. yds. placed by bulldozer at 80 cents per yd_ 632.80
2,890.95
15% overhead and profit_ 433. 63
3, 324.58
CONCLUSION OR LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover and their petition is dismissed.