Laramore, Judge,
delivered the opinion of the court:
This is a claim for damages arising from acts of the United States which plaintiff alleges constituted a breach of a contract between plaintiff and the United States for construction work at the Greater Pittsburgh Air Force Base.
The case was tried by a commissioner of this court who, on May 31,1961, filed detailed findings of fact.
On October 13,1961, plaintiff filed a “statement” submitting its claim without brief, electing to submit the case on the commissioner’s report.
On November 3,1961, defendant’s motion to dispense with oral argument and submit on the commissioner’s report and defendant’s brief was allowed.
Under these circumstances it is unnecessary at this time to summarize the facts since the facts as found by the commissioner, which are adopted by the court, are dispositive of the issues, and in the absence of exceptions thereto by plaintiff are taken to be correct. (Buie 48 of the Buies of this court.)
Plaintiff’s claim is twofold. The first is a claim for equitable adjustment by reason of the allegation that “* * * Defendant knew or should have known that contractor’s bid for the gas distribution system did not include an item for *122 excavation and backfilling” and that “Contractor believes that it is entitled to an equitable adjustment * * * for the trench excavation and backfill * *
Finding 16 discloses that if plaintiff did not include any amount in its bid for items 104-113, to cover the cost of trench excavation for gas lines, as stated in the petition, such omission constituted a mistake, or misunderstanding, of the contract provision, paragraph 8-22 of the technical provisions, which provided that payment for pipe in the gas lines at the applicable unit price per linear foot included trench excavation and backfill.
Finding 16 also discloses (footnote 3) that there was nothing in the price plaintiff bid which would have placed defendant on notice that the cost of excavation and backfill was not included in the figure submitted, if in fact it was not.
Since the contract clearly provided that payment for the gas mains at the unit price bid included payment for excavation and backfill and plaintiff has been paid for all the gas mains at the contract price, there is no basis upon which it can recover an additional amount for excavation and backfill. Hyde Park Clothes, Inc. v. United States, 114 Ct. Cl. 424, 435-436; S. N. Nielsen Company v. United States, 141 Ct. Cl. 793.
In connection with the above, it is also noted that the Armed Services Board of Contract Appeals denied plaintiff’s claim, and the findings show that this decision was not arbitrary and was supported by substantial evidence. In the absence of a showing that the decision is arbitrary or not supported by substantial evidence, this court will not disturb the decision of the Board.
Plaintiff’s second claim is for an additional amount alleged to be owing its subcontractor because a slag-gravel combination was employed for the four-inch select base course material rather than the “red dog” upon which its bid was based.
In respect to this claim, the facts show that at no time was the contract changed to upgrade the specification requirements for the four-inch select base course material. Since there was no change in the requirements under the contract, and plaintiff merely performed its contractual obligation, *123 there is no basis for recovery herein. Kenneth Ward Anderson, et al. v. United States, 143 Ct. Cl. 729.
Moreover, the contracting officer also denied this portion of plaintiff’s claim and this denial was upheld on appeal by_ the Corps of Engineers Claims and Appeals Board and the Armed Services Board of Contract Appeals. The facts show that the Armed Services Board of Contract Appeals’ decision was not arbitrary and was supported by substantial evidence. Absent a showing to the contrary, this court will not disturb the decision of the Board.
Upon the facts as found, the court finds that plaintiff has proven no basis upon which recovery could be granted. Accordingly, plaintiff’s petition will be dismissed.
It is so ordered.
Durfee, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff Moyer Brothers is a partnership consisting of A. C. Moyer and J. E. Moyer, engaged in general contracting business; and the plaintiff Moyer Brothers brings this action in its own right and to the use of Kean-Wise, Inc., its subcontractor, who furnished labor and material for construction of the select material base course.
2. Invitation for bids was issued by the defendant June 21, 1951, for the construction of buildings, utilities, taxiways, and aprons at the Greater Pittsburgh Air Force Base, Allegheny County, Pennsylvania. The invitation for bids was amended by Addenda Nos. 1, 2,3,4,5, and 6, dated June 26, July 2, July 2, July 6, July 9, and July 11,1951, respectively. Opening of bids took place on July 17, 1951.
,3. The plaintiff prepared its cost estimates prior to receiving any of the six addenda to the invitation for bids.[1]
*124 The original invitation for bids, issued June 21,1951, contained a Unit Price Schedule, a section entitled Special Conditions 15 “Estimated Quantities.” The relevant portions of these provisions are as follows:

The invitation for bids also included a Technical Provisions section in which were the following relevant sections:
4-01 Scope. The work covered hj this section of the specifications consists in furnishing all plant, labor, equipment, appliances, and materials, and in performing all operations in connection with the excavation, trenching, and backfilling for utilities systems beyond a line 5 feet outside of all buildings and structures, for all utilities connected thereto, complete, in strict accordance with this section of the specifications and the applicable draw *125 ings, and subject to the terms and conditions of the contract.
4-06 Methods of measurement. Trench excavation, rock excavation, refill replacing unstable material, and the sheeting and bracing ordered left in place and to be paid for will be the measured quantities involved in the completed work.
a. Trench excavation. The trench excavation to be paid for will be the lineal feet of trench measured along the center line and excavated within the limiting depths shown on the Drawings. In the measurement for trench excavation no deduction will be made for rock excavation.
$ # ‡ $
4-07 Basis of payment. All payments will be based on completed work performed in strict accordance with the Drawings and this specification, and on the contract bid and payment schedules.
a. Trench excavation. The quantity of trench excavation to be paid for will be the number of lineal feet of trench excavated and satisfactorily backfilled, determined as hereinbefore specified, payment of which will constitute full payment for trench excavation and back-filling, including the furnishing, placing, and removing of sheeting and bracingj and all incidentals necessary to complete the work required by this section of the specifications.
*****
8-22 Measurement and payment. All measurements and payments will be based on completed _ work performed, in strict accordance with the Drawings, specifications, and contract payment schedules. No payment will be made under this section for excavation, backfill-ing, or grading. Payment for such work will be made under Section 4, EXCAVATION, TRENCHING, AND BACKFILLING FOR UTILITIES SYSTEMS, of these specifications.
a. Measurement. * * *
b. Payment. Payment will be made for the pipe in the mains and service lines at the applicable unit price per linear foot of pipe of various sizes and materials, which price will be full compensation for all pipe, joints, specials, and fittings, complete and in place. * * *
As originally drafted the invitation for bids contained an inconsistency or ambiguity with respect to the provisions for *126 payment for trench excavation and backfill for gas lines, and the contractor was apparently mislead in preparing estimates for the gas distribution system. The unit price schedule and the statement of estimated quantities quoted above would seem to indicate that trench excavation for gas lines was not deemed to be a separate item. However, section 8-22 of the technical provisions stated that payment for excavation and backfilling “* * * will be made under section 4 * *
4. Addendum No. 2 to the invitation for bids was issued on July 2, 1951. This addendum amended the unit price schedule on items 104-118, paragraph SC-15 “Estimated Quantities” on items 104.-113, and paragraph 8-22 to read as follows:

8-22 Measurement and payment. All measurements and payments will be based on completed work performed, in strict accordance with the drawings, specifications, and contract payment schedules.
‡ ^ $ i]:
b. Payment. Payment will be made for the pipe in the mains and service lines at the applicable unit price per linear foot of pipe of various sizes and materials, which price will be full compensation for all pipe, joints, specials, and fittings, including trench excavation and backfill, complete and in place.
*127 5. Addendum No. 2, dated July 2, 1951, relating to the payment for excavation and backfill for gas lines removed the inconsistency in the original invitation for bids, in that the reference to payment under section 4 was deleted from paragraph 8-22 and there was added a specific provision that payment for the pipe in the gas lines at the applicable unit price per linear foot “* * * will be full compensation for all pipe, joints, specials, and fittings, including trench excavation and backfill, complete and in place.” The phrase “including excavation and backfilling” was deleted from the unit price schedule and the schedule of estimated quantities. None of the addenda to the invitation for bids changed the requirement in the invitation for bids, issued June 21, 1951, with reference to the prices bid for items 10A-113.
6. Only two bids were submitted in response to the invitation for bids issued on June 21,1951, as amended by addenda 1-6, plaintiff’s and that of Dick Construction Co. With respect to the gas line items 104-113, the bids were as follows (in price per linear foot):

7.The bids as submitted by Dick Construction Co. and by plaintiff, listed several specific items for trench excavation for utility lines other than gas mains. Under “Sanitary Sewers,” item 76 lists 5,920 as the estimated linear feet of trench excavation required. The quantity of vitreous clay and cement pipe listed under sanitary sewers (items 80-83) totals 5,920 linear feet. Similarly, item 91 lists an estimated quantity of 8,880 linear feet of trench excavation for water lines; and the total quantity of asbestos-cement pipe and wrought iron pipe for water lines (items 93-95) is 8,880 linear feet. There are no further items listed in the bids for *128 trench excavation, but items 104-113 contain a total estimated quantity of 10,057 linear feet of gas pipe.
8. On September 5,1951, contract DA-36-109-ENG-1228 was executed between Moyer Brothers and the defendant. The contract as executed included the following pertinent provisions:
1. Statement of work. — The Contractor shall furnish the materials, and perform the work for construction of buildings, utilities, taxiway and aprons, at Greater Pittsburgh Air Force Base, Allegheny County, Pennsylvania, for the consideration stated in Schedules A, B, C, and D, Items and Prices, inserted between sheets 2 and 3 of this contract, in strict accordance with the specifications, schedules, drawings, and conditions all of which are made a part hereof and designated as follows: Specifications for Construction of Buildings, Utilities, Taxiway and Aprons at Greater Pittsburgh Air Force Base, Allegheny County, Pennsylvania, dated 22 June 1951, and Addenda Nos. 1, 2, 3, 4, 5, and 6, dated 26 Juno, 2 July, 2 July, 6 July, 9 July, and 11 July 1951, respectively. Drawings as listed and described in paragraph SC-2 of the specifications.
The work shall be commenced See Schedules A, B, C, and D, and shall be completed See Schedules A, B, C, and D.
*****
2. Changes and extras. — The Contracting Officer may at any time, in writing, and without notice to the sureties, order extras or make changes in the drawings and/ or specifications of this contract providing such extras or changes are within the general scope thereof. If any such extra or change causes an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim of the contractor for adjustment under this Clause must be asserted in writing within 30 days from the date of receipt by the contractor of the notification of extra or change: Provided, however, That the Contracting Officer, if he decides that the facts justify such action, may receive, and act upon any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Clause 6 hereof. But nothing *129 provided in this clause shall excuse the contractor from proceeding with the prosecution of the work as changed.
* * * * *
6. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall reduce his decision to writing and send by registered mail, return receipt requested, a copy thereof to the contractor at his address shown herein. Within 30 days from the receipt thereof, the contractor may appeal in writing to the Chief of Engineers, whose written decision thereon, or that of his designated representative or representatives, shall be final and conclusive upon the parties hereto unless, within 30 days after receipt thereof by the contractor, he appeals in writing to the Secretary of the Army, which appeal shall operate to vacate said decision of the Chief of Engineers. If the dispute is determined by the Secretary of the Army, his written decision, or that of his designated representative or representatives, shall be final and conclusive upon the parties hereto. The Chief of Engineers or the Secretary of the Army may designate an individual, or individuals, other than the Contracting Officer, or a board, as his authorized representative to determine appeals under this article. In any proceeding under the provisions of this article, the contractor shall be afforded an opportunity to be heard and offer evidence in support of his appeal. Pending decision of a dispute hereunder the contractor shall diligently proceed with the performance of this contract. Any sum or sums allowed to the contractor under the provisions of this article shall be paid by the Government as part of the cost of the work herein contracted for and shall be deemed to be within the contemplation of this contract.
7. Payments to contractors. * * *
i}? íjí
(c) All material and work covered by progress payments made shall thereupon become the sole property of the Government, but this provision shall not be construed as relieving the contractor from the sole responsibility for all materials and work upon which payments have been made or the restoration of any damaged work, or as a waiver of the right of the Government to require the fulfillment of all of the terms of the contract.
*130 9. Inspection. — (a) Except as otherwise provided in subparagraph (d) hereof, all material and workmanship (if not otherwise designated by the specifications) shall be subject to inspection, examination, and test by representatives of the Contracting Officer at any and all times during manufacture and/or construction (and at any and all places where such manufacture and/or construction are carried on.) The Government shall have the right to reject defective material and workmanship or require its correction. Rejected workmanship shall be satisfactorily corrected and rejected material shall be satisfactorily replaced with proper material without charge therefor, and the contractor shall promptly segregate and remove the rejected material from the premises. If the contractor fails to proceed at once with the replacement of rejected material and/or the correction of defective workmanship the Government may, by contract or otherwise, replace such material and/or correct such workmanship and charge the cost thereof to the contractor, or may terminate the right of the contractor to proceed as provided in Clause 5 of this contract, the contractor and surety being liable for any damage to the same extent as provided in said Clause 5 for terminations thereunder.
(b) The contractor shall furnish promptly without additional charge, all reasonable facilities, labor, and materials necessary for the safe and convenient inspection and test that may be required by the Contracting Officer. All inspections and tests by the Government shall be performed in such manner as not unnecessarily to delay the work. Special, full size, and performance tests shall be as described in the specifications. The contractor shall be charged with any additional cost of inspection when material and workmanship is not ready at the time inspection is requested by the contractor.
(c) Should it be considered necessary or advisable by the Government at any time before final acceptance of the entire work to make an examination of work already completed, by removing or tearing out same, the contractor shall on request promptly furnish all necessary facilities, labor and material. If such work is found to be defective or nonconforming in any material respect, due to fault of the contractor or his subcontractors, he shall defray all the expenses of such examination and of satisfactory reconstruction. If, however, such work is found to meet the requirements of the contract, the actual direct cost of labor and material necessarily in *131 volved in the examination and replacement plus 15 percent, shall be allowed the contractor and he shall, in addition, if completion of the work has been delayed thereby, be granted a suitable extension of time on account of the additional work involved.
11. Permits and responsibility for work. — The contractor shall, without additional expense to the Government, obtain all required licenses and permits and be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the prosecution of the work, and shall be responsible for all materials delivered and work performed until completion and final acceptance except for any completed unit thereof which may theretofore have been finally accepted.
*****
SC-13 Inspection. The work will be conducted under the general direction of the Contracting Officer and is subject to inspection by his appointed inspectors to insure strict compliance with the terms of the contract. The inspectors will direct the maintenance of the gages, ranges, location marks and limit marks in proper order and position. No inspector is authorized to change any provision of the specifications without written authorization of the Contracting Officer, nor shall the presence or absence of an inspector relieve the Contractor from any requirements of the contract.
SC-14 Payments. Payments will be made as provided in Article 16 of the contract. Unless otherwise authorized in writing by the Contracting Officer, the items of work for which payment will be made shall be limited to those listed and enumerated in the contract. The unit prices or lump sum price or prices stated in the contract will be used in determining the amount to be paid and shall constitute full and final compensation for all work. *****
SeotioN 4. — Excavation, Trenching, and BACKFILLING FOR UTILITIES SvSTEMS
4-01 Scope. The work covered by this section of the specifications consists in furnishing all plant, labor, equipment, appliances, and materials, and in performing an operations m connection with the excavation, trenching, and backfilling for utilities systems beyond a line 5 feet outside of all buildings and structures, for all utilities connected thereto, complete, in strict accordance *132 with this section of the specifications and the applicable drawings, and subject to the terms and conditions of the contract.
* * * * *
4-03 Excavation.
a. General. The contractor shall perform all excavation of every description and of whatever substances encountered, to the depths indicated on the drawings. * * *
* $ * * ❖
4-05 BacJcfiTling. * * * The trenches shall be carefully backfilled with the excavated materials approved for backfilling, consisting of earth, loam, sandy clay, sand 'and gravel, soft shale, or other approved materials, free from large clods of earth or stones, deposited in thoroughly and carefully rammed 6-inch layers, until the pipe has a cover of not less than one foot for water or gas mains, and 2 feet for sewer mains. Sewer mains wiS then be checked by the Contracting Officer to determine whether any displacement of the pipe has occurred. The test will be as follows: A light will be flashed between manholes or, if the manholes have not as yet been constructed, between the locations of the manholes, by means of a flashlight or by reflecting sunlight with a mirror. If the illuminated interior of the pipe line shows poor alinement, displaced pipe, or any other defects, the defects designated by the Contracting Officer shall be remedied by the contractor at his expense. The remainder of the backfill material shall then be thrown into the trench, moistened, and tamped in 1-foot layers.
Hi Hi % # sjc
4-07 Basis of payment. All payments will be based on completed work performed in strict accordance with the Drawings and this specification, and on the contract bid and payment schedules.
a. Trench excavation. The quantity of trench excavation to be paid for will be the number of lineal feet of trench excavated and satisfactorily backfilled, determined as hereinbefore specified, payment of which will constitute full payment for trench excavation and back-filling, including the furnishing, placing, and removing of sheeting and bracing,_ and all incidentals necessary to complete the work required by this section of the specifications.
*133 Sectioh 8. — Gas Distribution System
8-22 [as amended by addendum 2, dated July 2, 1951] Measurement and 'payment. All measurements and payments will be based on completed work performed, in strict accordance with, the drawings, specifications, and contract payment schedules.
a. Measurement. * * *
b. Payment. Payment will be made for the pipe in the mains and service lines at the applicable unit price per linear foot of pipe of various sizes and materials, which price will be full compensation for all pipe, joints, specials, and fittings, including trench excavation and backfill, complete and in place.
* * * * *
10-04 Materials. Select base-course material shall consist of pit-run gravel, stone, slag, disintegrated granite, quarry waste, sand, screenings, soil; combinations of these, or other approved materials. The maximum dimension of any particle of the selected base-course material shall be not greater than two-thirds the compacted thickness of the layer in which it is to be placed, unless otherwise approved by the Contracting Officer. Oversize material shall be removed by screens, grizzlies, or by hand picking. All material used in the select-material base course shall be subject to approval by the Contracting Officer.
a. Sources of select material. Select material shall be obtained from pits selected by the contractor, pits designated by the Contracting Officer, field excavation, or from other approved sources. Preliminary approval of pits shall not mean that all material found in the deposit will be acceptable. Only materials from approved sources, processed and blended as directed by the Contracting Officer, and conforming to the requirements specified herein, will be acceptable.
b. Sampling and testing. All samples shall be supplied by the contractor at his expense. All tests to determine the requirements specified herein will be performed under the supervision of the Contracting Officer without cost to the contractor. The source of the select material shall be selected in advance of the time when the select material will be required in the work, and suitable-sized samples shall be submitted to the Contracting Officer not less than 15 days before commencing the work. Additional samples of select material shall be furnished during construction as required by the Contracting Officer. Field testing, to determine if the density require *134 ments for tbe base course as specified in paragraph 10-13 are met, will be performed by the Contracting Officer without cost to the contractor. Unless otherwise directed by the Contracting Officer, A.S.T.M. Serial Designation D75-42T shall be used for sampling materials.
* * * * *
10-08 Weather limitations. Select-material base courses shall be constructed only when the weather conditions do not detrimentally aifect the quality of the finished course. Any areas of the base course that are damaged by the effects of freezing temperatures or other weather conditions, during any phase of the construction, shall be aerated if required, reshaped, and recom-pacted by the contractor to conform with the requirements of the specification, without additional cost to the Government.
*****
10-15 Maintenance. The finished base course shall be maintained in a condition satisfactory to the Contracting Officer until the succeeding course is to be constructed.
9. Contract DA-36-109-ENG-1228 as executed on September 5,1951, contained Schedules A, B, C, D of Items and Prices. Under item 76, Trench Excavation, the total estimated quantity listed on Schedules A-D equals 5,920 linear feet. Schedules A-D list a total of 5,920 linear feet of pipe for sanitary sewers, items 80-84. Schedules A-D list a total of 8,880 linear feet of trench excavation under item 91 and a total of 8,880 linear feet of water pipe under items 93-95. The price listed for trench excavation on item 76 is $2.20 per linear foot. The price listed on item 91 for trench excavation is $2 per linear foot. The $2.20 per linear foot in item 76 in Schedules A-D was the contract price for trench excavating for sanitary sewers and the $2 per linear foot in item 91 in Schedules A-D was the contract price for trench excavation for water lines. There are no items other than items 76 and 91 for trench excavation in Schedules A-D.
10. Trench excavation for sewage lines was the deepest type of excavation required by the contract. This was true because it was necessary in installing these lines to maintain a level of fall which would facilitate movement of the sewage through the lines. In order to maintain the desired grade, the drawings provided at several places that a deep trench *135 excavation be made. In certain areas the trench excavation for sewage lines ran to a depth of at least seven feet.
11. It was necessary that trench excavation for water lines be deeper than that for gas lines, but not as deep as was required for sewage. The contract required that the water lines be laid below the frost line or at a depth of about 48 inches.
Trench excavation for gas lines was the shallowest required by the contract. It was provided that the pipe be covered by at least two feet of earth except under roads, where an earth coverage of three feet was specified.
12. Contract DA-36-109-ENG-1228 required that, after the utilities lines were laid, the trench would be backfilled in “* * * carefully rammed six-inch layers, until the pipe [had] a cover of not less than one foot for water or gas mains and two feet for sewer mains * * *. The remainder of the backfill [was to be] tamped in 1-foot layers.” The contract also provided that the payment received for trench excavation would constitute “* * * full payment for trench excavation and backfilling, including the furnishing, placing, and removing of sheeting and bracing, and all incidentals necessary to complete the work * *
13. In view of the requirements that: (1) a grade line be maintained in the sewage lines, with the resulting necessity for deep trenches; (2) the water lines be laid below the frost line; (3) the backfilling be added in six-inch layers with each layer tamped up to one foot in gas and water lines and two feet in sewage lines, and then tamped at every one-foot level for the rest of the backfill; it would appear that trench excavation for sewerage was the most difficult type of trench excavation, with trench excavation for water lines being less difficult than for sewerage and that for gas lines the least difficult. Plaintiff’s bid and contract DA-36-109-ENG-1228 provided $2.20 a linear foot for trench excavation for sewerage and $2 a linear foot for trench excavation for water lines. The bid submitted by the Dick Construction Co. listed $1.25 per linear foot for trench excavation for water lines and $2 per linear foot for trench excavation for sanitary sewers.
14. Plaintiff claims it would cost $2.20 per linear foot for trench excavation for gas lines. Accepting the figures in *136 plaintiff’s estimate of the cost of $2.20 per linear foot except that relating to its estimate for the operation of a backhoe, defendant’s expert witness computed a reasonable cost for excavation for trenching for gas mains to be $.90 per linear foot. That computation for the operation of a backhoe appears to be similar to that contained in the Building Estimator’s Reference Bools, Twelfth Edition (Walker) .[2]
15. Plaintiff bid $2.20 per linear foot to cover excavation for trenching for sanitary sewers (Dick Construction Co. bid $2) and $2 per linear foot for water lines (Dick Construction Co. bid $1.25). Both of these excavation operations were more difficult than that required for gas lines. A reasonable cost for excavation for trenching for gas lines would not exceed $1 per linear foot. Plaintiff performed 1,275 linear feet of trench excavation for gas lines.
16. If plaintiff did not include any amount in its bid for items 104-113, to cover the cost of trench excavation for gas lines, as stated in the petition, such omission constituted a mistake, or misunderstanding, of the contract provision, paragraph 8-22 of the technical provisions, which provided that payment for pipe in the gas lines at the applicable unit price per linear foot included trench excavation and backfill.[3]
17. Contract DA-36-109-ENG-1228 provided that a four-inch select material base course be employed under the concrete paving in the parking aprons plaintiff was to construct at the Greater Pittsburgh Air Force Base. The purpose of the four-inch select material base course was to provide a frost-free, free-draining material below the surface of the concrete, and thus prevent cracking of the concrete by water underneath expanding as it froze. The requirements for the select material were set out in paragraph 10-04 of the specifications. In particular, paragraph 10-04 stated, in part:
Select base-course material shall consist of pit-run gravel, stone, slag, disintegrated granite, quarry waste, *137 sand, screenings, soil; combinations of these, or other approved materials. * * * All material used in the select-material base course shall be subject to approval by the Contracting Officer.
Paragraph 10-04 provided for the contracting officer’s approval of the source of the select material but also stated “Preliminary approval of pits shall not mean that all material found in the deposit will be acceptable.”
■18. Prior to submitting a bid on the contract, plaintiff invited another contractor, Kean-Wise, Inc., to quote a price on the furnishing of the four-inch select material base course. Kean-Wise, Inc., obtained a copy of the relevant select base course material specifications, and determined to base its quotation upon the use of “red dog” for this work. “Ked dog” consists of a waste material from coal mines. It frequently lies above and beneath the seams of coal and, when removed and piled, it ignites spontaneously and smoulders. When well burned, it becomes a hard, tile-like reddish material. But there is a wide variation in its hardness, depending upon the source of the material itself and the degree to which it has been burned. Unless it is well burned, it is subject to deterioration and pulverization when exposed to the elements. Bed dog is common in the mining areas of western Pennsylvania, and much of it is used in road construction in the vicinity of Pittsburgh.
19. Based upon the use of red dog for the four-inch select base course material, Kean-Wise, Inc., submitted a price of $.70 per square yard ($.20 for the red dog and $.50 for labor) to plaintiff to cover the price of select base course material in place at the contract site. To this $.70 plaintiff added $.29 per square yard, apparently for cost of preparation of the special subgrade and compaction, plus profit and overhead, and submitted its bid to the Government of $.99 per square yard. The other bidder for the contract, Dick Construction Co., submitted a bid of $.94 a square yard for the four-inch select material base course. As executed, contract DA-36-109-ENG-1228 provided a unit price of $.99 per square yard for the four-inch select material base course.
20. The contract as executed on September 5, 1951, provided the contractor with a wide range of materials to use *138 for the four-inch select material base course. Bed dog, not being specifically mentioned in the materials enumerated in the specifications, came within the general category of “* * * Qthgj. approved materials.” When plaintiff had the subgrade approximately 80 percent prepared, Kean-Wise, Inc., submitted to the defendant two bags of red dog, constituting a 50-pound sample of the material it proposed to use for the four-inch select material base course. The red dog sample submitted by Kean-Wise was tested by the defendant for gradation and for hardness and quality of material and was approved early in November of 1951. No examination of the source of the red dog sample was made by the defendant in the fall of 1951.
21. Following the approval of the sample of red dog it submitted, Kean-Wise commenced to install the four-inch select material base course. Kean-Wise was able to work for about three weeks before bad weather forced closing of the job until the spring. During this period of time, Kean-Wise delivered 124 truckloads of red dog to the construction site from the red dog pit approximately seven miles away. Each truckload contained nine to ten tons of red dog, and the amount delivered covered 4,000 square yards of the four-inch select material base course.
22. In the fall of 1951, Kean-Wise paid $2 per truckload to its supplier of red dog. A truck could not make more than two round trips from the red dog pit to the construction site in one hour.
The 4,000 square yards of red dog which Kean-Wise laid in the fall of 1951 cost, for the material plus its transportation to the site, $744, or $.186 per square yard.
23. In the early spring, prior to the time operations were again commenced at the construction site, an examination of the select material base course laid the previous fall was made by the defendant’s engineers who had tested and approved the 50-pound sample of red dog which Kean-Wise previously submitted. In their opinion, the material was badly weathered, and had deteriorated to such an extent that, based on a visual examination, it would not meet the gradation requirements of the specifications. The engineers then proceeded to conduct an inspection of the pit which was the *139 source of the red dog delivered in the fall of 1951 by Kean-Wise. Inspection revealed that the material in the pit was not of uniform quality, much of it consisting of soft weathered shale and unbumed clinkers. The engineers rejected that pit as a source for select base course material, although, in their opinion, red dog of suitable quality could be used. The engineers then informed defendant’s resident engineer of their finding with respect to the condition of the 4,000 square yards of red dog on the site and the quality of red dog in the pit which they inspected.
24. Prior to commencing operations in the spring of 1952, plaintiff was informed by the defendant’s resident engineer (Mr. Eait) that red dog would no longer be an acceptable material for the four-inch select base course material. Kean-Wise offered to submit samples of red dog from many pits other than the pit used for the 4,000 square yards delivered in the fall of 1951, but this offer was not accepted by the defendant’s resident engineer. Neither Kean-Wise nor plaintiff appealed to higher authority from the resident engineer’s determination that red dog would not be acceptable for the four-inch select material base course. Kean-Wise did not submit any additional samples of red dog for the four-inch base course. No change order was issued to contract DA-36-109-ENG-1228 modifying the specification requirement for the four-inch select material base course. The resident engineer had no authority to change the terms of the contract or to commit the defendant to pay additional amounts for extra work under the contract.
25. In the spring of 1952 Kean-Wise submitted to defendant’s engineers samples of various materials proposed for use as the four-inch select material base course. A material composed of a combination of granulated slag and river gravel was approved by or on behalf of the defendant. Kean-Wise and plaintiff then determined that the additional cost of the slag-gravel combination over red dog was $.35 a square foot; and, on April 9, 1952, they prepared a letter, which plaintiff sent on that date, to the defendant’s resident engineer. The letter requested an increase in the contract unit price for the four-inch select material base course from $.99 per square yard to $1.34 per square yard. There was a *140 quantity of unsuitable material which had to be removed from an area near where the 4,000 square yards of red dog had been placed in the fall of 1951. In the spring of 1952 the plaintiff removed the unsuitable material and replaced it with the unacceptable 4,000 square yards of red dog which was removed from the site where it had been placed in 1951. Kean-Wise then proceeded to place a four-inch select material base course of slag and gravel on the site. Plaintiff was paid for the unacceptable, red dog used to replace the removed unsuitable material referred to above at the unit price for borrow of $.98 a cubic yard. Kean-Wise placed 44,112 square yards of four-inch select material base course, for which plaintiff was paid $.99 a square yard, or a total of $43,670.88.
26. The cost to Kean-Wise of the 44,112 square yards of slag and gravel delivered to the contract site as select base course material was $17,396.11. The cost to Kean-Wise, if it had used red dog instead of slag and gravel for the 44,112 square yards of select material base course, would have been $8,204,83, in the event red dog could have been obtained in the spring of 1952 at $2 per truckload. Kean-Wise paid $3 a truckload for a small amount of red dog obtained in May of 1952. If red dog was used by Kéan-Wise at $3 per truckload, the cost to Kean-Wise of the 44,112 square yards of select material base course would have been $9,572.30. The difference in Kean-Wise’s cost between red dog and the slag-gravel combination employed would have been $9,191.28, if red dog was $2 a truckload, or $7,823.81 if it was $3 a truckload. Mr. A. C. Moyer, a partner in the firm of Moyer Brothers, plaintiff in this suit, testified that plaintiff recognizes a liability to Kean-Wise of $15,400, representing the sum of $.35 a square yard which Kean-Wise and plaintiff agreed would be the difference between slag and gravel furnished by Kean-Wise and red dog. Neither Kean-Wise nor plaintiff has placed the obligation on its books of account or written records.
27. By a letter dated March 16,1953, the District Engineer, Corps of Engineers, responded to plaintiff’s letter of April 9, 1952 (finding 25), to the defendant’s resident area engineer. Plaintiff’s claim for a $.35 increase in the unit price for the *141 four-inch, select base course material was denied by the contracting officer in his findings of fact and decision, dated October 15, 1958. Plaintiff entered an appeal from that decision to the Corps of Engineers Claims and Appeals Board. After a hearing was held, the Board denied plaintiff’s claim, in a decision dated October 20, 1954. Plaintiff appealed from the decision of the Corps of Engineers Claims and Appeals Board to the Armed Services Board of Contract Appeals (hereafter referred to as the ASBCA). Under daite of February 7,1956, the ASBCA denied plaintiff’s claim. Pursuant to plaintiff’s motion for reconsideration, the ASBCA issued a further decision on May 8,1958, in which plaintiff’s motion for reconsideration was denied.
28. By letters dated January 5 and 28,1952, plaintiff submitted a claim for payment of $2.20 per linear foot for excavation for trenching for gas lines. Plaintiff’s claim was denied by the contracting officer on November 4, 1952, and plaintiff appealed the denial to the Corps of Engineers Claims and Appeals Board. After a hearing was held, the Corps of Engineers Claims and Appeals Board issued a decision, on November 29, 1954, denying plaintiff’s claim. Plaintiff appealed from the decision of the Corps of Engineers Claims and Appeals Board to the ASBCA, which agency, on February 7,1956, issued a decision denying plaintiff’s claim. Plaintiff’s motion for reconsideration was denied by the ASBCA on May 8,1956.
29. Based upon testimony and exhibits before the ASBCA (with respect to plaintiff’s claim for $2.20 per linear foot for gas line trench excavation, and for an additional $.35 per square yard for 44,112 square yards of the four-inch select material base course) and the evidence adduced during the trial here, it is found that the ASBCA’s decisions denying plaintiff’s claims were not arbitrary and are supported by substantial evidence.
CONCLUSION ON LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and, therefore, the petition is dismissed.

 At a pretrial conference held on August 7, 1959, it was stipulated by the parties that the testimony before the Armed Services Board of Contract Appeals and the Corps of Engineers Claims and Appeals Board “* * * can be used in making findings as to the ultimate facts in this case without the necessity of recalling those witnesses * *

 In evidence as defendant’s Exhibit 5, pp. 90-91.

 In its petition, paragraph 14, plaintiff has alleged that from the amount of the bid defendant should have known that its bid for gas pipes did not include an item for excavation and backfilling. It would not appear, however, in view of the amount of the Dick Construction Co. bid, which was lower than plaintiff’s for each of the gas pipe items, that there was present such a variance in the prices that defendant would be put on notice as to a possible mistake by plaintiff.